A. P. GODDARD *et al.*

*v.*

MARIA ENZLER, Admx.

*Opinion filed October 23, 1906.*

1. TRIAL—*when case involving death from an electric shock is properly left to jury.* In an action for the death of an employee from an electric shock, the case is properly left to the jury under evidence showing the defendant employers, who operated the electric plant, had notice, twelve hours before the injury, that the wires from the transformer which caused the death were carrying excessive voltage, and with reasonable diligence might have remedied the defect or warned deceased of his danger.

2. EXPERT TESTIMONY—*answer to proper hypothetical question does not usurp functions of jury.* The functions of the jury are not usurped by an expert witness who gives his opinion upon an assumed state of facts which the evidence tends to prove and which calls for some special skill or knowledge to reach the proper conclusion, since the opinion of the witness has no bearing upon the question whether facts assumed in the question have been proved.

3. SAME—*objection that answer is based on facts not included in question should be made at the time.* An objection that the an-

swer of an expert witness to a hypothetical question was based upon facts not included in the question should have been made at the time the answer was given, by a motion to strike it out, and can not be first urged on appeal.

4. EVIDENCE—*when exclusion of evidence is not error.* The exclusion of evidence as to the condition of certain electric wires, the excessive voltage of which caused the death of plaintiff's intestate, is not prejudicial error, where such evidence related to a time after the fatal shock was received, and it further appears from the evidence that defendants knew of the dangerous voltage such wires were carrying, long enough before the accident to have remedied the defect or warned deceased of the danger.

5. DAMAGES—*children's loss of instruction and moral training may be considered.* In an action to recover damages occasioned to minor children by reason of the death of their father, caused, as alleged, by the defendants' negligence, the jury may consider, in estimating damages, the loss to such minor children of instruction and moral training by reason of their father's death, where the evidence tends to show such loss.

APPEAL from the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Stephenson county; the Hon. R. S. FARRAND, Judge, presiding.

W. N. CRONKRITE, (R. J. CARNAHAN, of counsel,) for appellants.

DOUGLAS PATTISON, for appellee.

Mr. CHIEF JUSTICE SCOTT delivered the opinion of the court:

This was an action of case brought in the circuit court of Stephenson county by Maria Enzler, as administratrix of the estate of John Anton Enzler, deceased, against A. P. Goddard and A. J. Goddard, the appellants, to recover damages occasioned to the widow and minor children of said John Anton Enzler by reason of his death. The jury returned a verdict for $3500 in favor of the administratrix. After overruling a motion for a new trial and a motion in arrest of

judgment the court entered judgment upon the verdict. Appellants appealed to the Appellate Court for the Second District, where the judgment of the circuit court was affirmed. A further appeal has been prosecuted by appellants to this court.

The evidence tends to establish the following facts: On November 14, 1902, appellants were operating an electric light plant and an electric street railway system in the city of Freeport. In connection with their railway system they used a large brick building as a street car barn, in which cars were kept, cleaned and repaired. This barn had a flat roof covered with a pitch and gravel composition, and a floor of cinders packed about eight or ten inches deep. It was lighted with electricity from the electric light plant. Some of the wires used in the electric light plant, known as primary wires, carried from 2000 to 2280 volts of electricity and were exceedingly dangerous. Other wires, known as secondary wires, when in proper and ordinary condition carried only 104 volts and were harmless. The primary wires were only used to transmit the high voltage from the generator to transformers, where the high and dangerous currents were reduced to low and harmless currents of 104 volts, which were transmitted from the transformer, over the secondary wires, to and into buildings for lighting purposes.

A vinegar factory was located back and immediately east of the car barn. North, and across the street from the car barn, was a pole bearing a transformer. Two primary wires extended from a pole in the car barn yard over the roof of the barn to this transformer and carried the dangerous current of electricity to the transformer. Several sets · of secondary wires were supplied with electricity from the transformer, each set consisting of two wires. One of these sets of wires extended from the transformer, parallel with the two primary wires, over the flat roof of the car barn and furnished the electricity for lighting the car barn. An-

other set of secondary wires from the same transformer furnished electricity to the vinegar factory for lighting purposes.

At about nine o'clock in the morning of November 14, 1902, an employee of the vinegar factory, while holding in his hand an electric cord in the cellar of that factory, received a shock from the cord which rendered him unconscious and seriously burned and injured his hand. This electric cord connected with the secondary wires which were supplied with electricity from the transformer across the street from the car barn, and was supposed to carry only a harmless current of 104 volts, the same as the secondary wires. F. W. Siecke, the proprietor of the vinegar factory, telephoned to the office of appellants and informed the person who answered the call that one of his employees had been injured by the electric cord, and that there was apparently a stronger current on the wire than there should be. He was told that the matter would be attended to. Siecke testified that his recollection was that he talked to A. J. Goddard over the telephone. When Goddard was called as a witness on behalf of appellants, he testified that he did not receive any such message from Siecke on that day but that he was told a few days later that such a message had been sent. About three o'clock in the afternoon of the same day another employee of the vinegar factory was rendered unconscious and his hand severely burned while holding another electric cord in the cellar of the vinegar factory. Shortly afterwards Siecke communicated with one Parker, who was engaged in the electrical wiring business in the city of Freeport, and Parker sent an electrician named Baumgartner to the vinegar factory to discover and remedy the trouble with the wires. Baumgartner found the electric cord which had caused the injury to one of the employees above referred to, in defective condition and replaced it with a new one. He then took hold of the new cord and received a severe shock, which knocked him down. The cord

was taken from him immediately and before he had received any serious injury. Baumgartner then went to appellants' power house, where he found A. J. Goddard at about 5:15 o'clock in the afternoon, and told him about the shock he had received at the vinegar factory. Goddard requested him to return immediately and throw the switch which was located at the entrance of the secondary wires into the factory. By throwing this switch the current of electricity passing over the secondary wires to the building would be prevented from entering the building. A similar switch was located just outside of every building into which electric wires extended. Baumgartner did as requested. About six o'clock in the afternoon A. J. Goddard and the superintendent of the electric light plant went to the vinegar factory, which they found locked. It was almost dark. From the ground they made an examination of the primary and secondary wires in that vicinity but discovered nothing out of order.

The car barn, as hereinbefore stated, was lighted with electricity supplied from the same transformer as was the vinegar factory. One of the incandescent electric lamps or bulbs which furnished light for the car barn was attached to one end of an electric cord, the other end of the cord being connected with secondary wires coming from the transformer above mentioned over the roof and into the car barn. This cord was an ordinary electric cord, consisting of small wires covered with insulating material, the electricity being transmitted over the wires in the cord to the lamp or bulb. The cord was about twenty-five feet in length, was flexible, and permitted the lamp to be taken to any part of the barn within a radius of twenty-five feet from the point where it connected with the other wires. When not in use the bulb was kept hanging upon the wall of the barn.

John Anton Enzler, on November 14, 1902, was, and for some time prior thereto had been, in the employ of appellants engaged in night work at the car barn, working

from six o'clock P. M. to six o'clock A. M., and it was frequently necessary for him, in the performance of his duties, to use the electric lamp attached to the cord. In doing so it was customary to grasp the cord at a point near the bulb and carry it in that manner. At nine o'clock in the evening of November 14, 1902, being the same day the employees of the vinegar factory were injured, one of appellants' employees, upon entering the car barn, found Enzler lying upon his back on the floor of the barn near the place where the electric bulb was kept hanging on the wall, grasping said cord near the bulb in his right hand, and the cord emitting electric sparks at the place where Enzler was grasping it. Enzler's hand had been severely burned by the electric cord, and he was then either dead or in a dying condition. When physicians arrived he was dead, and their testimony in this case shows that his death was caused by the electric shock.

The declaration in the case contained nine counts. Some of the counts alleged the existence of particular defects, and the charges of negligence in those counts were based upon such defects. It was thus alleged that the insulation around the wires in the electric cord which Enzler grasped was worn and defective; that the insulation on the primary and secondary wires passing over the car barn was defective; that such wires had been constructed and maintained in too close proximity to each other and had become crossed; that the transformer which supplied electricity for the car barn was defective, and permitted a high and dangerous current to pass from the primary wires entering the transformer to the secondary wires issuing from the transformer; and that a defective fuse plug or block had been installed and maintained at the entrance of the secondary wires into the car barn. One count charged negligence, generally, in permitting the machinery, dynamos, wires and appliances to remain in bad and unsafe repair and condition after notice of such condition, without specifying any defect in any par-

ticular part of the system, and another count charged negligence in failing to warn Enzler of the dangerous current of electricity passing through the cord. Appellants filed the general issue.

A large part of the evidence in the case consists of testimony given by expert electricians. Many facts of great assistance to the jury were established by such witnesses. It was thus shown that 104 volts of electricity would not kill nor burn a human being, and that it requires at least 500 volts to cause death. It was further shown that if, by any means, a high current should have been communicated to one of the wires issuing from the transformer, it would have extended to and over all secondary wires connected with that transformer. It therefore appeared, without contradiction, that at various times on November 14, 1902, and as early as nine o'clock in the morning of that day, the secondary wires entering the car barn, and the electric cord which Enzler was required to use at night, were transmitting an unusual and dangerous current of electricity. It is apparent that these facts, together with proof that appellants knew, or could by exercising ordinary care have known, of the existence of this unusual current on the secondary wires, would have imposed upon appellants the duty of preventing such current from entering the car barn or the duty of warning Enzler that such current was passing through the electric cord, and that for a breach of one or the other of such duties, after the lapse of such time as, under the circumstances, would have been reasonable, appellants would be liable for the death of Enzler. It was shown that shortly after nine o'clock in the morning Siecke telephoned to the office of appellants that the secondary wires were transmitting an unusual current of electricity; that one of the appellants was informed of the same fact at 5:15 o'clock in the afternoon by Baumgartner, and it further appeared that there was located in the dynamo room of appellants' plant an instrument, known as a ground detector, which should

have indicated a ground on the wires at each of the times the employees were injured at the vinegar factory and at the time Baumgartner received the shock. There was therefore evidence from which the jury might reasonably conclude that appellants had notice of the existence of the dangerous current on the secondary wires a sufficient length of time before Enzler was killed to have prevented such current from entering the car barn at the time when it became necessary for Enzler to handle the electric cord, or had such notice a sufficient length of time before the accident to have warned Enzler of the presence of the unusual current passing through the cord.

Appellants first complain of the action of the court in permitting an expert electrician to answer the following question propounded by appellee:

Q. "Suppose that a primary two-wire circuit, carrying about 2200 volts alternating current, ran to a general electric ten-kilowat transformer on a pole; that from the transformer a secondary circuit, supposed to be carrying 104 volts, supplying incandescent lights, ran back alongside of the primary wires and from ten to twelve inches distant from them to a pole and thence to a car barn; that from and inside the car barn an insulated flexible wire ran back to an incandescent electric light, and a man who was standing on cinders, packed about ten inches deep, grasped hold of the insulated wire or of the light socket and received a shock of electricity which burned his hand and killed him; will you state in your opinion how he might have received that shock?—Ans. He might have received that shock by the primary current leaking on to the secondary wire to which the man had his hand attached, and through his feet to the other side of the generator which generated the current which produced the high voltage primary that you speak of."

The principal complaint made to this question is, that it calls for the opinion of the expert upon the very question to be decided by the jury, and amounts to an usurpation by the

witness of the functions of the jury. From the nature of expert testimony every hypothetical question propounded to an expert in any case may call for an opinion upon some issue or fact which is to be determined by the jury, and it is therefore not always a good objection to such question that it calls for an opinion upon a question to be decided by the jury. The opinion of an expert is admitted in any case only from necessity, where some special knowledge not possessed by persons in general, and hence not presumed to be possessed by the jury, is required in reaching a proper conclusion from a given state of facts, and its admission is in nowise an invasion of the province of the jury. The expert witness has nothing whatever to do with settling controverted questions of fact or with determining the credibility of witnesses. His opinion is based upon a state of facts which is assumed to be true, and he is not permitted to express an opinion as to whether the evidence establishes the assumed state of facts rather than some other state of facts which the evidence tends to prove. It is the province of the jury to determine whether the state of facts assumed by the expert to be true has been established by the evidence. In case they find that such state of facts has been established, then they are authorized to adopt the opinion of the expert as their conclusion upon that state of facts; but if they find that such assumed state of facts has not been established, then the opinion of the expert, as a matter of course, cannot be followed by them. It is therefore apparent that the functions of the jury are not usurped by an expert witness who gives an opinion upon some assumed state of facts which the evidence tends to prove, where it requires some special knowledge or skill in order to reach the proper conclusion from that state of facts.

The statement found in *Chicago and Alton Railroad Co. v. Springfield and Northwestern Railroad Co.* 67 Ill. 142, to the effect that an opinion covering the very question to be found by the jury is improper, evidently means that an opin-

ion cannot be expressed upon the ultimate question to be found by the jury, which in this case was whether appellants had been guilty of negligence which caused the death of Enzler. The question above quoted does not call for an opinion on that question, and hence is not subject to this objection made against it.

It is next urged that the question was not based upon the evidence. So far as the question itself is concerned there is no foundation for such objection, as the evidence tended to prove all the facts assumed therein. From appellants' argument, however, it would seem that the objection intended to be made is, that the witness based his opinion upon certain alleged facts which were not included in the question and not shown by the evidence, but which, from the answer, appear to have been taken into consideration by the expert and assumed by him to be true. If the answer is subject to such criticism appellants are in no position to complain as they made no motion to strike out the answer, and the objectionable feature did not appear when the court made its ruling upon the question.

We are not called upon to decide whether the above question is objectionable for any reasons other than those above considered.

It is next urged that the court committed reversible error in permitting expert electricians to answer the following questions propounded by appellee:

Q. "How could a higher current than 104 volts get in those secondary wires?—Ans. By the primary and secondary wires getting crossed with one another, the wind blowing them together accidentally, or there might be a leakage in the transformer."

Q. "Does that sometimes happen,—a leakage in the transformer?—Ans. It does on some occasions. Lots of times a transformer is overloaded and it overheats it, and it gets affected in that way."

Q. "Might a transformer be so affected that a higher current than 104 volts, and still not 2280 volts, could go along that secondary wire?—Ans. On one side, yes, sir. "

Q. "Suppose those wires should blow together and those uninsulated points should come together for an instant; would that be long enough for that high voltage you speak about to go through?—Ans. Yes, sir.

Q. "How might it be possible to have 500 volts flowing along an incandescent or secondary wire where the following facts are true: that it was a two-wire circuit carrying about 2000 volts alternating current, running to a general electric ten-kilowat transformer on a pole, and that from the transformer a secondary circuit supposed to be carrying 104 volts, supplying incandescent lights, ran back alongside of the primary wires, and from ten to twelve inches distant from them, to a pole and thence to a car barn?—Ans. I would think it would be some defect in the transformer."

Q. "Might it happen from a contact between the primary and secondary wires outside of the transformer at a point where there was no insulation on the primary and secondary wires?—Ans. It might; yes, surely, if they swung together."

If it be conceded that in the absence of evidence tending to prove that some defect did in fact exist in the transformer and that primary wires came in contact with secondary wires, testimony that the excessive voltage might have gotten upon the secondary wires by reason of such defects was improperly admitted, still the appellants could not have been prejudiced by the admission of such evidence for the following reason: In order to find from this testimony that there was any defect in the transformer or any wires crossed, the jury must necessarily have first found that there was a dangerous current of electricity on the secondary wires, as the testimony of the experts in regard to such defects was all predicated on the presence of such current on those wires; and if appellants had or ought to have had notice of any

defects in the transformer or wires, it was because the evidence showed that they had or ought to have had notice of the presence of the dangerous current on the secondary wires. If the jury found that there was an unusual and dangerous current on the secondary wires, and that appellants had or ought to have had knowledge of its presence, then, as hereinbefore said, they owed Enzler the duty of preventing the dangerous current from passing over the cord when he was required to handle it or the duty of warning him of its presence on the wires in the cord, and for a breach of one or the other of these duties appellants would be liable. The evidence in regard to a possible defect in the transformer or wires being crossed could therefore have only been considered by the jury as tending to show additional negligence on the part of appellants, and could not have affected the verdict in this case. The same is true of a diagram used by an expert electrician in showing how a leak might take place between the primary and secondary wires in a transformer by reason of a defect in the transformer.

Appellants offered to show by a witness that such witness received a shock from the secondary wires leading into the car barn about three o'clock in the morning after Enzler was killed and after the primary wires had been detached from the transformer. This evidence would not have tended to furnish any excuse for failing to prevent the dangerous current from entering the car barn or for failing to warn Enzler of its presence on the wires in the cord, and it was therefore not error to exclude it.

A. J. Goddard, one of the appellants, was called as a witness on behalf of appellants, and testified that after the accident to Enzler he made an examination of the wires, taking until nearly two o'clock in the morning. He was then asked in what condition he found the wires upon that examination. Appellee objected. The objection was sustained, and the appellants now complain of that ruling. It was not denied that some defect existed which permitted an

excessive current to escape to the secondary wires. What that defect was, or whether, after the accident, A. J. Goddard was able to discover it during the night with the aid of a lantern, could not have affected the verdict in this case. Such examination would not have tended to show any exercise of ordinary care to avoid the injury, nor would it have rebutted any of the evidence tending to show that appellants knew or could by reasonable diligence have known of the presence of the dangerous current on the wires in the cord. The rejection of the testimony was therefore not prejudicial.

It is next contended that the court gave to the jury, at the request of appellee, an instruction to the effect that in fixing the damages they might take into consideration the matter of the instruction and moral training of the minor children of deceased, so far as the same appeared from the evidence. It is said that such anticipated loss of instruction and moral training consequent upon the death of the father is not an element of damages in cases of this character. The contrary is expressly decided in *Illinois Central Railroad Co.* v. *Weldon,* 52 Ill. 290, and in *Chicago, Rock Island and Pacific Railroad Co.* v. *Austin,* 69 id. 426, where it is held proper to instruct the jury that they may take into consideration loss of instruction and moral training, if any, to the minor children by reason of the death of their father, where the evidence tends to show such loss. There was therefore no error in giving the instruction in this case, as the evidence tended to show damage to the minor children on account of the loss of instruction and moral training through the death of Enzler.

Other objections made to rulings of the trial court are entirely without merit.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*

FARMER and VICKERS, JJ., took no part in the decision of this case.