(No. 11938.—Reversed and remanded.)

ALFRED L. PEDERSON, Plaintiff in Error, *vs.* THOMAS C.
NIXON *et al.* Defendants in Error.

*Opinion filed June 20, 1918—Petition stricken October 3, 1918.*

1. DEEDS—*burden of proof is on husband seeking to set aside
wife's deeds.* Where a husband sues to set aside his wife's deeds
on the ground that the property conveyed, which stood in the wife's
name, was purchased with his money, the complainant must es-
tablish such fact by clear, strong and unequivocal evidence.

2. SAME—*grantee standing in fiduciary relation must rebut pre-
sumption of undue influence.* Where a conveyance is made to a
person occupying a relation of trust and confidence to the grantor
and confers a beneficial interest upon the grantee it is presumed
that it was procured through his undue influence, and the burden
of proof is on him to rebut the presumption.

3. EVIDENCE—*admissibility of statements in presence of person
who does not deny them.* Statements made in the presence of a
person and not denied are admitted in evidence against him on the
theory that his silence when he might and naturally would deny
the statements if they were untrue is regarded as an acquiescence
in their truth, but unless his conduct, under the circumstances, is
such as to raise a reasonable inference that he admitted the truth
of the statements they are inadmissible.

WRIT OF ERROR to the Superior Court of Cook county;
the Hon. DENIS E. SULLIVAN, Judge, presiding.

CLELAND, LEE & PHELPS, for plaintiff in error.

WILLIS E. THORNE, for defendants in error.

Mr. JUSTICE DUNN delivered the opinion of the court:

On July 1, 1916, the plaintiff in error, Alfred L. Peder-
son, filed a bill against his wife, Alice M. Pederson, and
others, to set aside two deeds executed by her on June 22,
1916, conveying certain real estate to Thomas C. Nixon,
James S. Nixon and George A. Nixon, her brothers, and
Emily Hintz, her sister. Mrs. Pederson died on July 23,
1916, leaving her said brothers and sister and her nephew,

Oliver Jarvis, her heirs, having executed her will at the same time as the deeds in controversy, giving all her property to her brothers and sister, and stating therein that she purposely made no provision for her husband because in her judgment the provision made for him by law was ample. The will was admitted to probate, and on November 20 the complainant filed a supplemental bill showing the death of Alice and making Oliver Jarvis defendant. The bill alleged that the complainant bought and paid for the premises described in the deeds but the title was taken in his wife's name; that when she executed the deeds she had been suffering for some weeks with a cancer, which had destroyed her eyesight and eaten away various parts of her body and had rendered her physically and mentally helpless and incapable of knowing what she was about or attending to any business; that she was of unsound mind, and that the deeds were procured through the undue influence of Thomas C. Nixon. The answer denied that the complainant paid for the premises, that Mrs. Pederson was of unsound mind or that any undue influence was used to induce the execution of the deeds.

The complainant is a native of Denmark and came to this country in 1896. He came to Chicago and after working for several years at his trade as a tailor began business for himself. Soon after, in 1902, he met Mrs. Alice Mund, a widow, whose husband, a railroad engineer, had died about a year before and who was then living by herself near the complainant's shop. She had four rooms rented, and the complainant rented one of her rooms from her and continued to room at her house until they were married, in December, 1914. He added men's furnishing goods to his business, and it is claimed by the defendants in error that Mrs. Mund became a partner in the store in 1905, paying $100 for her interest, though the complainant in his testimony denies that she ever had any interest in the business. He says that he kept some of his money in the house and

put some of it in the Illinois Trust and Savings Bank; that Mrs. Mund usually deposited it, one-half in his name and one-half in hers by agreement between them; that he had no particular purpose in that agreement but just did it that way, and that he owned both accounts. Both accounts were introduced in evidence, and his, beginning with a deposit of $100 on June 28, 1905, shows credits to October 5, 1907, of $686.50, $685 of which was withdrawn between November 25, 1907, and February 25, 1908. Mrs. Mund's account, beginning in 1901 with a balance of $900, the proceeds of her husband's life insurance, shows credits of $840.29 to January, 1908, and withdrawals of $1045.38, leaving a balance of $694.91, of which she withdrew $650 on January 15. In January, 1908, the complainant went on a trip to Denmark and was gone two months. When he got back to New York he telegraphed to Mrs. Mund for $25, which she sent him. He says he employed a tailor named Olaf Nelson to run the business while he was away, but the man turned the money over to Mrs. Mund, $100, which she gave to him on his return less the $25 sent to New York, saying that was the profits of the business while he was gone.

The property in question consists of two parcels, the first of which was purchased in September, 1908. The means for the purchase of the second parcel were obtained through a mortgage on the first, so that the determination of the ownership of the first parcel determines the question as to the other also. Mrs. Mund negotiated the purchase of the property in the absence of the complainant, assisted only by her brother, Thomas C. Nixon. The deed was made to her and she personally paid the purchase price to the seller, whom she met at his agent's office, having gone there for the purpose with her brother and taken the money with her in gold, in a leather bag. Pederson claims that he had some money which he wanted to invest and that he asked Mrs. Mund to look for a piece of property. After

she found this property he went and looked at it and told her to go and see the agent. She did so and he bought the property. He claims to have given her the gold with which she paid the purchase price, which he had saved out of his business. He only deposited part of his money in the bank. A part he kept in a glass jar in the basement under the store. He left it there during his trip to Denmark. Mrs. Mund knew about it. He said he put it in the glass jar for the reason that she did not want paper money lying around, and if he had a twenty-dollar bill she would get it changed for gold and advised him to put it in the basement so nobody would get it. Then his story is that he went away and left it there, putting a stranger in charge of the store. He gave this gold to Mrs. Mund and permitted her to invest it in real estate in her own name, with no receipt or evidence of any kind that he had any interest in the transaction. She managed and controlled the property as her own, rented and improved it, collected the rents and to all appearances was the exclusive owner. The claim of the complainant rests only on his own testimony, uncorroborated by any circumstance except some casual statements testified to have been made by Mrs. Pederson as to Pederson's interest in the property. His story is improbable. During the time that he was accumulating this money he was keeping a savings bank account, which at no time amounted to as much as $700, and it seems unlikely that he would have kept this considerably larger sum of money in the insecure way he testifies when he was accustomed to depositing his money in the bank. There is no evidence that there was any engagement of marriage between the complainant and Mrs. Mund, or any arrangement between them because of which the complainant might reasonably have caused the conveyance to be made to her. She had the $650 which she had withdrawn from the bank in January and $400 which her brother paid her in August of an $800 loan which she had made to him from the amount re-

ceived from her husband's life insurance. She was also earning money as a hairdresser and manicure. It is much more reasonable to presume that the money with which she paid for the deed was derived from these sources than to believe the fanciful tale of the complainant. The burden was upon the complainant to establish the fact that the consideration of the deed was paid with his money, by clear, strong and unequivocal evidence. (*Baughman* v. *Baughman,* 283 Ill. 55.) The preponderance of the evidence is to the contrary.

Mrs. Pederson had been afflicted with a cancer for a long time and prior to her marriage to the complainant it had reached a somewhat advanced stage. It advanced rapidly, and after April, 1916, she was confined most of the time to her bed and required the attendance of nurses, and her husband gave up his business and devoted practically all his time to attending to her wants. She grew worse and her condition was incurable and beyond hope of improvement. She made a will in April, 1916, by which she devised all her property to her husband except $5000, which she directed to be divided equally among her three brothers and her sister. The nurses found it hard to get along with her, and the difficulties of taking care of her at home induced her husband to think it desirable that she should go to a hospital. She was very much opposed to this, and on June 10 she asked her husband to telephone to her brother Thomas, with whom she had frequently consulted in regard to her business and who had been of assistance to her in the purchase of the property in controversy. Thomas came to the house and she told him that she did not want to go to a hospital, and he assured her that she would not have to go to a hospital. From that time he took charge of the household. The complainant remained in the house and was called on by the nurses to assist in various ways in caring for his wife, but she was very unfriendly to him and he spent most of the time in the basement, where he was

always ready to respond to any call for assistance by those in charge of his wife's comfort. On June 22 the brother, Thomas, his lawyer, a notary public, and two other men who came as witnesses, came to the house with the deeds in controversy and a will prepared for Mrs. Pederson's execution, and they were executed. She was unable to sign them, but a pen was placed between the fingers of her left hand and the nurse guided the hand and made the mark with the pen in Mrs. Pederson's hand. The evidence as to her mental condition is conflicting, and six nurses and two physicians gave their opinion that she was mentally incompetent. During all the month of June, at any rate, she was ill-tempered and quarrelsome. She abused her husband and nurses and was profane in her language. According to some of the witnesses she talked and acted irrationally. There is evidence which would justify the finding that during a part of the time, at any rate, she was of unsound mind. There is evidence, on the other hand, of a greater number of witnesses, nurses, physicians and others, that while her physical condition was weak and she suffered great pain her mind was not affected, and it cannot be said that the chancellor who heard the witnesses testify was mistaken in finding that unsoundness of mind was not established by a preponderance of the evidence.

Thomas Nixon, the brother, was the person upon whom she had relied in the transaction of important business. She had lent him, years before, the money which she had received from her husband's life insurance. She sought his advice in regard to the purchase of the property in question here and consulted with him in regard to the management and improvement of it. A few days before these deeds were made she had him summoned to the house and he then took charge of her and her affairs. The husband, with whom she had been living on good terms, and whom, so far as appears, she regarded with affection and in whose favor she had made a will giving him substantially all of

her property less than two months before, was displaced in the house, apparently for no other reason than that she was offended at the proposition of going to a hospital. No attempt at reconciliation appears to have been made. She regarded her brother as a very wonderful character,—really, she said, a second Christ. He put his own family physician in charge of the case and installed new nurses. He brought his own lawyer to the house, had the deeds in question prepared and they were then executed. They conveyed to the grantees all the property which Mrs. Pederson could convey,—two-fifths to Thomas and one-fifth to each of the other grantees,—and she executed a will devising all of her property in the same proportion. In her weakened physical condition she was readily subject to the influence of the brother in whom she trusted so completely. Her recovery was hopeless and he had assumed full charge, employing the nurses and physician. The husband apparently submitted to the usurpation. He was present when the deeds were executed. So was Thomas, his lawyer, the notary public, the two witnesses, the physician and nurse,—all brought there by Thomas. She was offended at the complainant, as he knew, and any objection he might have made would probably have been without result except to cause a painful scene. Where a conveyance is made to a person occupying a relation of trust and confidence to the grantor and confers a beneficial interest upon the grantee it is presumed that it was procured through his undue influence, and the burden of proof is on him to rebut the presumption and show that it was not procured by undue influence. (*Dowie* v. *Driscoll,* 203 Ill. 480.) No such evidence was introduced. Thomas was the channel through which the intentions of Mrs. Pederson were made known. The conveyance was to his interest. The presumption is that he procured it. The presumption is not overcome by any evidence. The decree was erroneous in not finding that the deeds were obtained through the undue influence of Thomas Nixon.

On July 4, after the suit was begun, the attorney who prepared the deeds and will and represented the defendants to the bill went with Charles G. Palmer, a stenographer, to the home of Mrs. Pederson and in the presence of her brother, her husband and Mrs. Palmer had an interview with Mrs. Pederson, in which he read the bill to her and interrogated her in regard to the subject matter of it, her life with Pederson, the purchase of the property, the execution of the deeds and all the transactions in connection with this case. The stenographer, who took down the entire interview in shorthand, gave his opinion that Mrs. Pederson was sane and capable of transacting business and testified from his notes to the whole conversation. This conversation was objected to by the complainant and was not admissible for the purpose of proving the truth of any of its statements. In connection with Palmer's opinion as to her soundness of mind it was competent as showing the basis of that opinion, but for any other purpose it was mere hearsay and incompetent. Pederson was present but took no part in the conversation and did not deny any of her statements. It seems to be supposed that they were therefore admissible in evidence as proof of the facts stated. The reason statements made in the presence of a person and not denied are admitted in evidence against him is, that his silence when he might and naturally would deny statements against his interest or imputing guilt to him if they were untrue is regarded as an acquiescence in their truth. Unless the language or conduct of the person, under the circumstances, is such that it is a natural and reasonable inference that he admitted the truth of the charge such statements are inadmissible. (*People* v. *Harrison,* 261 Ill. 517.) Pederson had already filed his bill, and the visit of the attorney with the stenographer was for the purpose of interviewing his client. It would have been improper and unreasonable for Pederson to interfere in that interview and take issue with his wife's statements. He would only have

caused a disturbance, resulting, probably, in his exclusion from the room. No inference that he admitted the truth of her statements can be drawn from his failure to contradict them under such circumstances. The statements can not be regarded as evidence of any fact but were competent only in connection with Palmer's evidence on the question of mental soundness.

The decree will be reversed and the cause remanded, with directions to enter a decree setting aside the°deeds.

*Reversed and remanded, with directions.*