Lloyd Eldon MILLER, Jr., Petitioner-Appellant,

v.

Frank J. PATE, Respondent-Appellee.

No. 13420.

United States Court of Appeals
Seventh Circuit.

Feb. 15, 1962.

Rehearing Denied April 9, 1962.

**415**

George K. Meuth, Cuba, Ill., Donald Page Moore, Chicago, Ill., for appellant.

William G. Clark, Atty. Gen., William C. Wines, Asst. Atty. Gen., Raymond S. Sarnow, A. Zola Groves and Aubrey Kaplan, Asst. Attys. Gen., Chicago, Ill., of counsel, for appellee.

Before HASTINGS, Chief Judge, and DUFFY and SCHNACKENBERG, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Lloyd Eldon Miller, Jr., petitioner, has appealed from an order of the district court dismissing a petition for a writ of habeas corpus, as amended, filed by petitioner, in which Frank J. Pate, warden of Stateville branch of the Illinois State Penitentiary, was named as respondent. From the amended petition it appears that petitioner is in the custody of respondent awaiting execution pursuant to judgment and sentence of the Circuit Court of Hancock County, Illinois. It charges that at his trial his rights under the due process clause of the fourteenth amendment to the constitution of the United States were violated, as more particularly hereinafter referred to.

Petitioner sets forth that he has exhausted his remedies in the courts of Illinois.

On January 11, 1956, petitioner was indicted in the Circuit Court of Fulton County, Illinois, for the murder of Janice May, aged eight years. He pleaded not guilty and the case was tried, resulting in a mistrial, and thereupon a change of venue was granted on defendant's motion to Hancock County, where a trial started on September 10, 1956. Defendant was found guilty by a jury which imposed the death penalty. A motion for a new trial was denied November 15, 1956, and judgment was imposed.

1. In its essential aspects, there is no denial on this appeal that petitioner committed the crime charged or that the evidence, aside from his confession, so proved. On the other hand, the appeal does raise the question as to whether petitioner was deprived of a fair trial because of the introduction of his confession of that crime.[1]

[1] Of course, a confession might be involuntary even though true. Rogers v. Richmond, 365 U.S. 534, 541, 81 S.Ct. 735, 5 L.Ed.2d 760.

In our consideration of petitioner's contention that he confessed the crime because coercion was exerted, we find a conflict in certain respects between his testimony and that of the state's witnesses. This conflict emphasizes the importance of determining petitioner's credibility, as well as that of witnesses who contradicted him. The credibility of witnesses was for the jury to decide. They had an opportunity to observe petitioner and the others as they testified in open court. Inasmuch as it is not now contended that the state failed to prove that petitioner committed the offense for which he was tried, it is inescapable, first, that the jury believed the state's witnesses who testified to facts showing that petitioner killed the eight-year-old girl, in an act of rape, and secondly, that they did not believe petitioner's testimony in denial thereof, when he testified as a witness in his own behalf.[2] Therefore, for our purpose in consideration of the contents of the entire record, we have a right to and do accept the jury's rejection of petitioner's credibility as a witness.

■■ 2. It is in view of this lack of petitioner's credibility that we now consider his testimony to support his claim of coercion. From our own examination of the abstract of the entire state trial court record submitted by petitioner to the district court, we are completely convinced that petitioner's confession was in no way a result of coercion. In this court the question of whether established primary facts underlying this confession prove that it was coerced or voluntary cannot rest on the decision of the Illinois Supreme Court. The responsibility of answering the question now rests upon us. Brown v. Allen, 344 U.S. 443, 507,

2. One instance of such a conflict between petitioner's testimony and that of a state witness is typical. Betty L. Baldwin, a prosecution witness whom petitioner's counsel attempted to impeach, testified that she was a waitress and had known petitioner for about two years. She also testified: She saw him at a cab stand in Canton about 10 P.M. Saturday, November 26, 1955. She rode in his cab to St. David, Illinois, her brother's home. The minute she got into the cab, petitioner asked her if she "had heard about the little May girl * * *"

She then testified,

"I said, 'yes,' and he started talking to me about what he knew of the case and I listened and made comments. * * * First he asked me if I knew about the little girl and I said, 'Yes, I did,' I had heard about it, and he asked me if I knew her and I said no, that I didn't know her. He then continued to say that he had seen where it had happened. * * * He was telling me, explaining to me what the little girl looked like. * * * He says, 'I don't see why any one would do anything like that.' I said, 'No, I feel that anybody that would do something like should be boiled in oil.' He said, 'No, I don't think they should be that rough on him.'"

She further testified that after she got to her brother's house,

"We sat there for a few minutes in the cab and he was talking about the same—about Janice May—and he spoke a few minutes on the same—about the same thing he had said before. I went into the house then and brought my little nephew out because Lloyd had never seen him, and he didn't like it very well, so I took the baby back in the house. I came back out and he usually opened the door for me, but he didn't that time, and I got in and sat down and he was looking straight ahead and didn't say anything for a few minutes and so I said, 'Lloyd, what is the matter?' Because he had acted so funny about my nephew. So, he just sat there and looked for a moment and then he turned around and looked at me and he went to sigh and he says. 'Betty, you know I did it.' * * * I just sat there and stared at him sort of dumbfounded. * * * He says, 'Well, they will never get me because I got rid of the things.' I didn't know what he meant and I didn't say anything. * * * He says, 'Betty, why do people do things they are ashamed of?' I said, 'I don't know.' * * * He asked me to leave with him that night. I tried to explain to him that neither one of us had the money to leave at that time and he still wanted to leave. * * * I didn't know what to say to him so I started to get out of the cab. I thought it was the best thing to do, and he reached over in front of me and got the door handle and he said for me to sit still. He said, 'If you say anything, the same thing will happen to you,' * * *

73 S.Ct. 397, 97 L.Ed. 469; United States ex rel. Jennings v. Ragen, 358 U.S. 276, 277, 79 S.Ct. 321, 3 L.Ed.2d 296. However, we, for convenience, now refer to significant parts of a statement of facts relevant to the claim of coercion, as stated by the Illinois Supreme Court, People v. Miller, 13 Ill.2d 84, 148 N.E.2d 455, which we have ascertained to be accurate by our examination of the state court proceedings. Beginning at 89 the court pointed out:

> Petitioner, according to his own testimony, left Canton at 3:45 A.M., November 27, drove 25 miles to Peoria, thence 10 miles to Pekin, where he abandoned his cab, changed his jacket for another, and at 5:55 A.M. boarded a bus for Champaign, Illinois, where he took a bus for Danville, Illinois, where he arrived at 11 A.M. and slept *for 24 hours* (emphasis supplied), after which he attended a movie. Fulton County authorities, armed with a warrant, charging him with larceny of the taxicab, traced his movements and were in Danville with the warrant, when at 8 P.M. November 28, while petitioner was making inquiries as to a bus to Detroit, he was arrested by a Danville detective and a Fulton County sheriff. He said: "If it's about that little girl in Canton, I didn't do it." He was questioned for 45 minutes by the Danville sheriff and Fulton County Sheriff Ball, concerning his departure from Canton and the murder of Janice May. According to his version, petitioner demanded a lie detector test; according to Ball's version, petitioner agreed to the test. In either event, Ball, a deputy, and petitioner left for Springfield at 11 P.M., and at 2 A.M. November 29 he was lodged in the Sangamon County jail. Petitioner was aroused at 6 A.M. and placed in the bullpen

along with other jail inmates. About 10:45 P.M. on November 30 he orally confessed the murder of Janice May and indicated his willingness to sign a confession.

> He was interrogated on three occasions, separated by periods of approximately 20 and 16 hours, for a total of something less than 11 hours.

Petitioner testified that Ball, while the two were alone in the interrogation room on November 30, became incensed and struck him on the tip of the shoulder, causing a bruise, which he showed to no one. Ball denied he ever struck petitioner.[3] If the chronology of events on November 30 testified to by Ball and four other officers is accepted as true, Ball and petitioner were not alone when the instance was supposed to have occurred.

Petitioner's charges that all the officials who dealt with him displayed a harsh and belligerent attitude which was manifested when they shouted at him, cursed him and uttered numerous threats, were expressly and completely denied by all who had anything to do with his custody and questioning. The Illinois Supreme Court held that in a case such as this the trial court, who had the opportunity to see and hear the witnesses, is the one most qualified to judge their credibility. That court entertained a moral certainty that petitioner knew what he was signing and that the evidence did little to establish that he capitulated through fear, hope or purported emotional upset. We have thoroughly considered the evidence in the record and agree with the foregoing results reached by the Illinois Supreme Court.

Moreover, we are impressed with the fact that the character and prior experience of petitioner indicated that he had

---

3. Petitioner testified that, while being questioned by Sheriff Ball, he said to the sheriff "You people are going to pay for pinning this crime on me", and the sheriff "got mad and hit me on my left shoulder; he didn't hit me square, he clipped me on the top of the shoulder; it didn't upset me too much. I just had a faint bruise but it didn't last. No one saw the bruise, because it was gone away."

not lived a sheltered life resulting in a sensitive, weak, shy, defenseless character. As the Illinois Supreme Court correctly found from the record, he was 29 years old, had finished the second year of high school and some training under the G.I. Bill of Rights, secured by misrepresenting that he had an honorable discharge, had met the intelligence requirements needed to enlist in the Army, Coast Guard and Air Force, had traveled extensively, and had wide and varied employment experiences. He changed his name to escape apprehension by military authorities and because he stole a car. He served a seven-months sentence on a California prison farm for "taking off" in the car, which was rented, and he was cautious enough on another occasion to find out if there were any warrants against him in Fulton County, Illinois, before he returned there. He changed jobs frequently, led a nomadic existence and entered into four hasty marriages.

Petitioner was not a weakling who would be expected to readily succumb to pressure. The crime which he had just committed showed a ruthlessness [4] that belied the slightest tendency to submit to coercion, if any had been exerted. Stein v. New York, 346 U.S. 156, 185, 73 S.Ct. 1077, 97 L.Ed. 1522.

3. Petitioner contends that the most important constitutional issue relates to his offer of the testimony of a psychiatrist "to provide evidence concerning Petitioner's 'power of resistance' to the pressures of police interrogation which were exerted upon him during the course of his incommunicado detention prior to his confession".

Petitioner also contends that "either psychiatric evidence of Petitioners 'power of resistance' was relevant to Petitioner's Fourteenth Amendment claim of coercion, or it was not." He also insists that his due process rights were violated because the trial judge refused to hear competent testimony by an examining psychiatrist. We believe that the real question confronting us is, was Dr. Donald Sweezey, the tendered psychiatrist, *competent* to express an opinion on the precise question which was to be put to him by defense counsel. Actually, that question would have called for an answer to an ultimate question of fact which it was the exclusive province of the trier of facts to give, as we shall now point out.

On the trial, petitioner's counsel made two offers of proof, both out of the presence of the jury.[5]

In the first offer he stated:

"  *  *  *  Defense offers to prove by the testimony of this defendant and the testimony of several other witnesses that defendant's behavior, especially during the last preceding eleven years, indicates a condition of complete emotional instability which renders him incapable of facing the normal and routine tensions of daily life. The condition is manifested by the complete unorthodoxy of his behavior when measured by accepted standards of our society. Defense further offers to prove by the testimony referred to above and by expert testimony that this defendant is a classic example of the inadequate, emotional personality as catalogued by the science of psychiatry. The defense further offers to prove that even the minimum amount of pressure, during an incommunicado

---

4. About an hour before her death, the eight-year-old victim of petitioner was found. She was unconscious from injuries described by a physician as being a crushing of the right side of the face, two skull fractures, a two and one-half inch laceration on the chin, abrasions on the neck, chest and back, a tear of the vagina with active bleeding, and a bulging of the rectum into the vaginal vault through the tear. She was almost nude and her body, which appeared to witnesses to have been pushed under the car [abandoned railroad mine car], was extremely bloody and had cinders imbedded in the buttocks.

5. A statement in his brief herein, that the second offer, *post* 8, was made *in* the presence of the jury, we find to be erroneous.

police interrogation would completely shatter this defendant's will to the extent that he would do anything demanded of him to gain temporary relief from the position and situation in which he found himself; that he would even sign a confession without regard to whether he was innocent or guilty or to whether the document is true or false. If permitted to adduce such proof, the defendant would himself take the stand and testify as to numerous occurrences and events and activities of his life which would show his behavior patterns and his instability emotionally. In support of the testimony of the defendant himself, the defendant, if permitted to adduce such proof, would produce other witnesses whose testimony would lend credence to the proposition that the defendant is a person of great emotional instability; that in particular the defendant would call his father, Lloyd Eldon Miller, Sr., his mother, Mrs. Jewell Miller, his wife, Dorothy Barger Miller, his ex-employer, Mr. Lawrence Johns, and Miss Melba Crushenski, all of whom would testify to facts of erratic conduct on the part of this defendant; that in addition to the witnesses named, if permitted to adduce such proof, the defendant would produce Dr. Donald Sweezey, a doctor of medicine and a qualified psychiatrist, who would testify, if permitted by the court to do so, that he examined the defendant on two occasions at the county jail in Lewistown, that the examinations conducted were the same type of examination conducted which he conducts with respect to patients who come to his office for medical assistance and that he is of the opinion, based upon reasonable medical certainty, that this defendant is a classic example of the completely inadeqate emotional personality and that *this defendant can not foresee the consequences of his acts and would under slight inducement and*

*pressure by interrogating officials have grasped any means offering temporary relief from the position in which he found himself and would have signed the purported confession in this cause without regard to whether he was innocent or guilty and without regard to whether the document placed before him was true or false."* (Italics supplied.)

In the second offer, he stated that if permitted,

Dr. Sweezey would qualify himself as an expert; that he made examinations of defendant necessary to make a psychiatric diagnosis or evaluation and found him to be "a classic example of an inadequate personality; that his findings were based on facts which are now adduced as part of the record in this cause and which were laid in part as a foundation for the testimony of the witness, Dr. Sweezey; that if permitted to testify, Dr. Sweezey would state his opinion to be that such a person, *confronted with the situation in which this defendant was placed by police and investigative officers in the manner shown of record here, would have signed a document placed before him regardless of its truth or falsity in order to escape from the situation in which he found himself"*. (Italics supplied.)

Both offers were denied by the court.

It is well to note that, while the premise for the findings assumed in the second offer of proof is stated to be "based on facts which are now adduced as part of the record in this cause and which were laid in part as a foundation for the testimony" of Dr. Sweezey, without being otherwise identified, this offer of proof would be subject to rejection according to the practice in most American courts, which recognize the proper method to be the submission of a hypothetical question, so that it is known to the court and jury what facts the expert witness has in mind when he gives an opinion.

**420**

As an example, we quote from a case cited by petitioner, People v. Geary, 298 Ill. 236, at 246, 131 N.E. 652, at 656, where the court said:

"The jury should make their finding from facts and circumstances properly proved on the trial, and expert witnesses should be examined, in a proper way, by making answers to hypothetical questions, and by detailing any facts that they may know tending to show the insanity or lunacy of the defendant * * *."

The proper procedure is recognized in People v. Black, 367 Ill. 209, 10 N.E.2d 801 where in a murder trial, a medical expert based his opinion, in part at least, on matters reported to him. In reversing a conviction. the court said, at 211, 10 N.E.2d at 802:

" * * * They were among the component factors from which his opinion was created and expressed upon a contested issue in the case. In exercising the function of weighing the evidence, a part of the foundation on which his opinion rested, he invaded the province of the jury. This was not proper. * * * The correct practice was to have asked the witness a question stating the facts which he assumed and upon which his opinion as an expert was determined. * * * The trial court committed prejudicial error in refusing to sustain defendant's objection."

To the same effect, see 23 C.J.S. Criminal Law § 883, p. 480.

However, we shall dispose of this appeal principally on other grounds.

■ As to the first offer of proof, insofar as it pertains to Dr. Sweezey, it indicates that he would testify that he examined petitioner twice in the county jail and, based thereon, he had an opinion that petitioner would, under slight inducement and pressure of interrogating officials, have signed "the purported confession in this cause" without regard to whether he was guilty or the document was true. This offer indicates that the doctor was ready to so testify without even knowing or considering the facts leading up to the signing of petitioner's confession. Such incredible testimony of an expert witness, without substantial factual basis, was obviously inadmissible.

As to the expert witness, the court did not err in denying the first offer of proof.

Although the court rejected petitioner's first offer of proof, which in part indicated he would call certain lay witnesses to testify to facts of erratic conduct by petitioner, the record shows that three of these witnesses were called by petitioner and their evidence pertaining to this facet was admitted. He called no more of them. Thus his mother testified that he failed in the 5th grade, that he returned from the army in 1947 and "then he started leaving, going different places, and then coming back home." He had jobs at several places which she named. He didn't stay very long any place or at home. He came and went. She accused him of roaming around.

His father, bearing the same name, testified that petitioner failed in the 5th grade and he got his son a job, but he didn't stay very long. He worked at International Harvester for 2 or 3 months, then went to Georgia. He came back and "took off" until September 1955 when he hitchhiked back home with only a suitcase containing blue jeans and other clothing. Because it was cold he wore one of his father's jackets. He worked for a farmer 3 or 4 days and worked as a cab driver in Canton until November 26th. His mother washed his clothes.

Lawrence J. Johns, a defense witness, testified that he was a taxicab owner and had employed petitioner from September 16, 1955 to November 26, 1955. Although petitioner called Johns as a witness, he was asked no questions pertaining to the alleged erratic conduct of petitioner, as suggested in the first offer of proof.

Petitioner in his own behalf testified without restriction.

It is apparent that he was permitted to get before the jury whatever lay evidence he desired as outlined in his first offer of proof. Thus, as to that evidence the question of the propriety of the denial thereof became academic.

▮ Petitioner's counsel attempts to support his position as to his second offer of proof by citing Illinois decisions. It will be noted that in the case at bar defense counsel did not seek by Dr. Sweezey's testimony merely to establish the mental condition of petitioner. This was so because neither insanity nor any other mental illness was an issue in this case, as it was in all of the cases cited by petitioner in his brief in support of his contention that Dr. Sweezey's offered proof was competent. Certainly a qualified witness might properly express an opinion as to the mental condition of petitioner. It is this proposition that is recognized by the Illinois cases which petitioner's brief cites.[6] Such testimony, if given credence by the jury, might have been of considerable help to it in passing upon one of the prime questions of fact in the case, that is whether petitioner's confession was voluntary or not. But the latter question was for the trier of the facts to decide and, if the trial court had permitted Dr. Sweezey to give his opinion as to whether such a person, "confronted with the situation in which this defendant was placed by police and investigative officers in the manner shown of record here, would have signed a document placed before him regardless of its truth or falsity in order to escape from the situation in which he found himself", the witness would be categorically deciding a question entrusted by law to the trier of facts. Such testimony would be a clear invasion of the province of, first, the judge, and, secondly, the jury.[7] The strong judicial support for our holding that this would be an invasion of the province of the trier of facts is typified by the following cases: United States v. Spaulding, 293 U.S. 498, 506, 55 S.Ct. 273, 79 L.Ed. 617 (1934); United States v. Roberts, 5 Cir., 192 F.2d 893 (1951); Farris v. Interstate Circuit, 5 Cir., 116 F.2d 409 (1941); Mack v. United States, 5 Cir., 268 F.2d 931, 934, note 6 (1959); Goddard v. Enzler, 222 Ill. 462, 78 N.E. 805 (1906); British Drug Houses Ltd. v. Battle Pharmaceuticals (Ex.Ct.) 4 D.L.R. 577 (1944); Regina v. Neil, (S.C.) 11 D.L.R.2d 545 (1959); Brown v. Brown, 89 Ga.App. 428, 80 S.E.2d 2 (1953); Welz v. Commercial Travelers Mut. Acc. Ass'n of America, 266 App.Div. 668, 40 N.Y.S.2d

---

6. Pederson v. Nixon, 284 Ill. 421, 120 N.E. 323; Fisher v. People, 23 Ill. 218; Hopps v. People, 31 Ill. 385; People v. Chism, 6 Ill.2d 262, 128 N.E.2d 729; People v. Jones, 6 Ill.2d 252, 128 N.E.2d 739; People v. Gavrilovich, 265 Ill. 11, 106 N.E. 521; People v. Geary, supra; People v. Krauser, 315 Ill. 485, 146 N.E. 593; People v. Lowhone, 296 Ill. 391, 129 N.E. 781; People v. Heirens, 4 Ill.2d 131, 122 N.E.2d 231; People v. Pugh, 409 Ill. 584, 100 N.E.2d 909; People v. Cochran, 313 Ill. 508, 145 N.E. 207; People v. Scott, 326 Ill. 327, 157 N.E. 247; People v. Moor, 355 Ill. 393, 189 N.E. 318; People v. Chrisoulas, 367 Ill. 85, 10 N.E.2d 382, 112 A.L.R. 990; People v. Jenko, 410 Ill. 478, 102 N.E.2d 783.

7. Obviously this statement is not affected by petitioner's mention of the Behavior Clinic of the Criminal Court of Cook County, Illinois, where, he says, psychiatrists "interview hundreds of criminal defendants with a view to testifying as to their mental competence at the time their crime was committed, or their mental competence to stand trial." The Behavior Clinic is a part of the Welfare Department of Cook County. It exists without express statutory authority. The nature of its work is reflected in excerpts from its annual reports submitted by petitioner. For instance, one report says: "Judges of the Criminal Court usually order mental examinations when there seems to be a sanity question at the time of a defendant's arraignment. * * * The report finally given the Court must set forth whether the defendant understands the nature of the charge against him and whether he is able to cooperate with counsel in the conduct of his defense."

There is no showing that psychiatrists of the Behavior Clinic express any opinion to the judges on any issue in any case, except as to the sanity question submitted.

128 (1943); Wood v. Michigan Millers Mutual Fire Ins. Co., 243 N.C. 158, 90 S.E.2d 310 (1955); Jimenez v. O'Brien, 117 Utah 82, 213 P.2d 337 (1949); Newton v. City of Richmond, 198 Va. 869, 96 S.E.2d 775 (1957).

We add to this list the following language from an authority selected by petitioner's counsel, People v. Geary, supra 298 Ill. at 246, 131 N.E. at 656:

" * * * expert witnesses * * should not be allowed to invade the province of the jury by deciding the very questions that the jury are required to pass on, as the three alienists were allowed to do in answering the two questions propounded to them by the court. * * * "

For that reason, no error was committed in the rejection of the second offer of proof.

4. What we have already said in this opinion leads to the conclusion that the principles announced in Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed. 2d 246, Stein v. New York, supra, Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948, and Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed. 2d 1037, have not been violated in this case.

5. Petitioner represents that after the jury had retired to deliberate on its verdict, "a member and members" of said jury requested further instructions be given to the jury, that the request was made through a bailiff to the trial judge, who directed the bailiff to inform the jury that he had given instructions and could give none further, that the bailiff so informed the jury, that all of the above occurred outside the presence of petitioner and unknown to him or to his trial counsel.

Petitioner cites Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674, in support of his contention that he had an absolute right to be present in court, to know the nature and fact of any communication between judge and jury, to object thereto or to take such position with respect thereto as the exigencies of the moment might dictate, that this "secret communication" materially affected petitioner's rights to such a great degree that the state court's denial to him of the right to be present violated the due process clause of the fourteenth amendment.

In the Snyder case, at 105-106, 54 S.Ct. at 332, the court said:

"We assume in aid of the petitioner that in a prosecution for a felony the defendant has the privilege under the Fourteenth Amendment to be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge. * * * Again, defense may be made easier if the accused is permitted to be present at the examination of jurors or the summing up of counsel, for it will be in his power, if present, to give advice or suggestion or even to supersede his lawyers altogether and conduct the trial himself. * * *

"In all the cases thus assumed the presence of the defendant satisfies the test that was put forward a moment ago as basic and decisive. It bears, or may fairly be assumed to bear, a relation, reasonably substantial, to his opportunity to defend. Nowhere in the decisions of this court is there a dictum, and still less a ruling, that the Fourteenth Amendment assures the privilege of presence when presence would be useless, or the benefit but a shadow. What has been said, if not decided, is distinctly to the contrary. * * * "

At 107, 54 S.Ct. at 333, the court stated:

" * * * So far as the Fourteenth Amendment is concerned, the presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only."

At 122, 54 S.Ct. at 338, the court concluded:

"* * * There is danger that the criminal law will be brought into contempt—that discredit will even touch the great immunities assured by the Fourteenth Amendment—if gossamer possibilities of prejudice to a defendant are to nullify a sentence pronounced by a court of competent jurisdiction in obedience to local law, and set the guilty free."

■ Petitioner has failed to show that there was any communication between the judge and the jury. He has succeeded merely in demonstrating that the judge refused to communicate further with the jury after the close of the trial. This did not constitute a deprivation of due process. The law does not require and reason does not suggest such a result.

6. Over a month before the date set for the trial of defendant, a contempt proceeding was instituted in the Circuit Court of Fulton County against one of petitioner's attorneys, for an attempt to intimidate Betty Baldwin, a state's witness heretofore referred to. A judge, other than the trial judge in this case, issued a rule to show cause returnable September 6, 1956 in Fulton County. On the latter date, petitioner moved for a continuance of his case in Hancock County to which it had been transferred on June 22, 1956, upon the ground that because of the pendency of the contempt proceeding he could not receive a fair trial, which motion was denied.

It further appears that the contempt proceeding was not pressed to a culmination prior to the completion of the trial of petitioner.

■ We cannot agree with his contention that "inherent prejudice" to him has been shown by these facts to such a degree that it constitutes denial of due process of law.

For the reasons herein stated, the order of the district court from which this appeal was taken is affirmed.

Order affirmed.

DUFFY, Circuit Judge (concurring in the result).

In my view, the majority has reached the correct result. However, there are statements in the opinion with which I do not agree and by which I do not wish to be bound.

It seems to me a complete *non sequitur* to say that because a man has committed a fiendish murder that he thereby demonstrates or proves that he is immune to all pressures and coercions which may be applied after he had been placed in custody.

Time after time the United States Supreme Court has given relief to defendants in brutal murder cases because of coercion that had been applied to such defendants after they had been taken into custody. I can recall no Supreme Court opinion where the Court went into the details of the crime in order to determine whether the defendant was such an individual as to be subject to coercion.

In Leyra v. Denno, Warden, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948, petitioner a 50-year old man, was charged with murdering his parents by beating them with a hammer. This crime could certainly be characterized as brutal and ruthless. The Supreme Court reversed the denial of an application for habeas corpus holding the confession elicited by a state-employed psychiatrist had been obtained by coercion in violation of the due process clause of the Fourteenth Amendment.

In Reck v. Pate, Warden, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948, the brutal murder of a Chicago physician was involved. In Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037, the offense was described as a "crime of community-disturbing violence." In these cases the Supreme Court held the confessions obtained by the police were involuntary because of the coercive methods used. In none of these opinions is there a consideration of the details of the crime itself as a factor indicating coercion or lack of coercion.

Many cases could be cited where the Supreme Court has reversed convictions because of the admission into evidence

424

of confessions obtained by coercion. Several examples are: Payne v. Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (first degree murder); Turner v. Pennsylvania, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810 (murder); Harris v. South Carolina, 338 U.S. 68, 69 S.Ct. 1354, 93 L.Ed. 1815 (double murder); Watts v. Indiana, 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801 (murder).

Here again, it apparently never occurred to the Supreme Court that the details of the crime and a narration of the injuries inflicted would be a factor in determining whether the defendant would be subject to coercion.

In my judgment, it adds nothing to the force or validity of the argument made in the majority opinion as to immunity from coercion, to narrate in minute detail the lurid and grisly details of the injuries suffered by the little girl, the innocent victim.