## RAYMOND v. UNION PAC. R. CO.

No. 7119. Decided March 17, 1948. (191 P. 2d 137.)

See 52 C. J., Railroads, sec. 2172. Custom as a standard of care, see note, 68 A. L. R. 1400. See, also, 44 Am. Jur. 625.

*Rawlings, Wallace & Black, Wayne L. Black* and *Woodrow D. White,* all of Salt Lake City, for appellant.

*H. B. Thompson, Bryan P. Leverich, A. U. Miner* and *M. J. Bronson,* all of Salt Lake City, for respondent.

WOLFE, Justice.

Appeal by plaintiff from a judgment of nonsuit entered in the Third District Court in an action by plaintiff against defendant for personal injuries allegedly sustained by plaintiff as a result of defendant's negligence. The parties will be referred to as they appeared in the court below.

The judgment of nonsuit was based on the grounds that plaintiff had failed to prove negligence on the part of defendant, and further, that plaintiff's own evidence showed that as a matter of law he was guilty of contributory negligence. If the trial court was correct as to either of the two grounds for decision, the judgment must be affirmed. But in reviewing a judgment of nonsuit, we must view the evidence, and the reasonable inferences therefrom, in the light most favorable to the plaintiff. If, in any reasonable view of the evidence, a jury could find that defendant was guilty of negligence, *and* that plaintiff was free of contributory negligence, then the judgment must be reversed.

It should be noted at the outset that plaintiff was not an employee of defendant, but of the Salt Lake Branch of the Ogden Arsenal, an agency of the United States Government. Hence, this case does not fall within the Federal Employers' Liability Act, 45 U. S. C. A. § 51 et seq., but must be decided on common law rules of negligence and contributory negligence.

At the time plaintiff sustained the injury complained of, he was 71 years of age, and had had nearly 40 years of

railroad experience. He was employed by the Arsenal as a switchman in his employer's yard. His duties were to spot railroad cars delivered by the carriers to the Arsenal yards for unloading.

On the morning of December 13, 1944, defendant railroad delivered to the Arsenal yard a gondola car loaded with scrap metal. The scrap consisted of eight open flat beds for dump trucks which were loaded in two layers, four on the bottom and four on top. The flat beds were crosswise of the gondola car. They did not fit tightly together, there being some space between them. The four beds along the bottom had other scrap metal in them—chains, engines, and miscellaneous automobile parts. At the time of the accident, the beds in the top layer were not set squarely on top of the beds in the bottom layer, but were somewhat offset. The miscellaneous scrap metal in the bottom row of beds was piled somewhat higher than the sides of the beds. Thus, the top layer of beds did not rest upon a flat surface or plane, but upon an unsmooth and irregular surface caused by the protrusion of the scrap metal above the sides of the beds in the lower tier. The net result was that the beds in the upper tier were in a state of rather unstable equilibrium.

The car in question was a steel body gondola type. The sides extended from 36 to 39 inches vertically from the floor of the car. There was a "T" iron around the top edge. There was a ratchet brake on one side of the car, at the corner, and on the same end of the car there was a platform about two feet wide extending the entire width of the car. This platform was at about the floor level of the car, and of course, on the outside of it. Also on the same end of the car, at a point just below the "T" iron and about 2½ feet from the side of the car where the brake was situated was a grab-iron.

In pursuance of his duties, plaintiff mounted the car at the point where it was delivered to the yards by defendant, for the purpose of having it spotted for unloading. The car was coupled to an engine and pulled over various tracks and switching points. The car was to be spotted at the unload-

ing point by means of a flying switch. A flying switch is a switching operation whereby momentum is imparted to the car to be switched by its being pulled by the engine. When sufficient momentum is gained, the car is uncoupled from the engine, which then pulls away and proceeds down one track. After the engine passes by the switch, the switch is thrown and the car is directed onto the proper track.

In this case, two freight cars were already standing at the point where the car in question was to be spotted. The track upon which these cars were standing was on a very gentle slope. Plaintiff knew that the brakes on those two cars had not been set, and he desired to couple onto them. He also realized that a slight jar would probably set them in motion and send them crashing into the side of the building.

In order that he might control the gondola car, during the switching operation plaintiff stood on the platform of the gondola car, with his left hand on the brake wheel and his right hand grasping the "T" iron at a point about 1½ feet to the right of the brake, or toward the center of the car. (Point X in the diagram.) This was about one foot to

the left and just above the grab-iron. Plaintiff's position was such that he was travelling backward. He slowed the car down until "it was just barely moving," not "anywhere near half as fast as a man would walk." Plaintiff was afraid that the car would not hit the other two cars with sufficient force to accomplish a coupling. He faced around to watch the coupling mechanism so that he would be cer-

tain that the pin dropped. He realized that if a coupling were not accomplished, the jar of the gondola car striking the other two cars would probably set them in motion; and it would be necessary for him to step over onto them and set their brakes.

As plaintiff was watching the coupling mechanism, and at the time the coupling was made, the truck body in the top tier and at the end of the car on which plaintiff was working, rocked or teetered toward the end of the gondola car, crushing plaintiff's right hand with which he was still grasping the "T" iron at the top of the gondola.

The top tier of truck beds projected about 6 inches above the sides of the gondola car. The truck body which had tilted forward onto plaintiff's hand was held by a loose cable which ran laterally across the car and longitudinally across the truck body. The cable touched the truck body only at its ends, and was fastened to the sides of the gondola by means of screw clamps.

The evidence further showed that loads similar to the one here involved came into the yards every day. Some of them were further secured by cables running longitudinally along the gondola; but there were no such cables in this case.

Plaintiff commenced this action against defendant to recover damages for the injury to his hand above mentioned. Plaintiff's theory was that defendant owed a duty to its consignee and to the employees of its consignee, to inspect all cars delivered to the consignee for the purpose of discovering defects and damages and to deliver them in safe condition. As heretofore noted, the trial court entered a judgment of nonsuit on the grounds that there was no evidence of negligence on the part of defendant, and that plaintiff was guilty of contributory negligence as a matter of law.

Plaintiff asserts and defendant admits that a railroad company will be held liable to a consignee or such consignee's employee if the railroad company delivers a defective car or a car with a defective load and such consignee or its employees are injured thereby. Of

course, employees of a consignee do not have the advantage of Federal Employers' Liability Act, and hence contributory negligence on their part will defeat recovery.

It has been urged by defendant that plaintiff offered no evidence of the type of inspection required to be made by defendant, or that such an inspection as was required was not made, or that if a proper inspection was made that it would reveal the condition which gave rise to plaintiff's injury, to wit, the unstable condition of the truck body in the end of the gondola. It is further argued that there has been no showing that the load was in the same condition at the time of the accident, as it was at the time it was delivered by defendant to the Arsenal yards. In the view we take of this case, these are matters of no great moment. Let it be assumed, for purposes of this discussion, that the truck body was in unstable condition at the time it was delivered to the Arsenal yard, and that a proper inspection would have revealed this fact to defendant.

The very purpose of gondola cars is to carry loose materials. That is what they are designed for; that is what they are used for. And where a railroad company carries loose material in a gondola car, its duty to deliver the load in safe condition is not so broad as to include a duty to make loose freight in a gondola car so firm and fast that it cannot move about in the car. Such a rule would amount to a prohibition of shipping of loose material. It may be that where the loose material carried consists of small objects of regular size and shape, such, for example, as bricks, that it (they) may be loaded in such fashion that the load cannot have any appreciable movement. On the other hand, where the loose material consists of diverse objects of varying sizes and irregular shapes, such, for example, as scrap metal, it is manifest that it would be economically if not physically impossible to load the gondola in such a fashion that the load might not shift somewhat within the car with the movement of the train. This does not mean that the railroad may load scrap metal or other material in such haphazard fashion that it might fall or

spill out of the car and injure some one working on or around it. Nor may the railroad load so carelessly and leave the freight so unstable that persons attempting to unload the car will likely be injured by the load's collapsing and falling upon them. But the railroad is not an insurer of its own employees, much less those of its consignee. It is not bound to make its loads accident proof. It would be too great a burden to cast upon railroads the duty to load loose materials in such a fashion that a person putting some part of his body inside a moving car of such loose materials could not be injured. Conceding for purposes of this argument that defendant knew or ought to have known that the truck bodies were not in stable equilibrium, we hold that defendant did not commit a breach of its duty to furnish a load safe for the employees of its consignee.

No claim is made that there was anything defective in the car itself. Plaintiff was not engaged in unloading at the time he was injured. He was engaged in a switching operation. To hold that defendant was guilty of negligence would be to hold, in effect, that defendant had a duty to anticipate that plaintiff would negligently put a portion of his body inside a moving carload of loose freight.

Turning now to the question of contributory negligence: As heretofore noted, plaintiff had had nearly 40 years of railroading experience as a switchman, brakeman, fireman, and conductor. He knew, and so testified, that gondola cars were used for carrying loose material. He ∎ likewise knew that every major railroad in the country, including the D. & R. G. for which he had worked for 36 years, had rules positively prohibiting employees from riding in or on loaded cars in such position that the load could injure them in case it shifted. No contention is here made that plaintiff was bound by those rules, but his knowledge of the rule indicated his familiarity with the dangers of shifting loads. Notwithstanding his extensive railroad experience, and his cognizance of the dangers of shifting loads he placed his hand in a position on and inside

the car in such a manner that a slight forward shifting of the load could and did injure it.

On cross-examination plaintiff testified as follows:

"Q. You knew it was extremely dangerous to put your hand in such a position on the top of that gondola; you knew that it was dangerous to, and unsafe thing to do, didn't you, Mr. Raymond, to place your hand on the end of that gondola so that * * * A. Yes.

"Q. If some of the load shifted you might get injured; you knew that? A. I wasn't expecting the load to shift.

"Q. Of course not. You wouldn't deliberately put your hand there? A. No.

"Q. *But you knew it was dangerous to put any part of your body inside of a loaded gondola when it is in movement, didn't you? A. It is.*" (Italics ours.)

On redirect examination plaintiff was led by his counsel into stating that what he meant by his testimony on cross-examination was that it was unsafe under the circumstances to put his hand inside the car, but that if the load had been tied down securely, it would not have been unsafe. The explanation offered by plaintiff on redirect examination can hardly be regarded as a satisfactory explanation of his cross-examination. The questions asked on cross-examination and particularly the italicized question quoted above, were not limited to the facts of this case. Counsel was clearly inquiring into the general situation; not just into the particular situation here involved. Nor was the answer of the witness limited in terms to a particular situation. He was testifying generally.

At a distance of approximately one foot from the position where plaintiff's right hand was grasping the "T" iron at the time he was injured there was a grab-iron. Plaintiff admitted that if he had been holding to the grab-iron instead of to the "T" iron that he would not have been injured. His explanation for not using the grab-iron was that it was the custom for switchmen to steady themselves by holding to the top of the car; and if he had held onto the grab-iron he would not have been able to operate the brake and at the same time turn around and watch to see whether

a coupling was accomplished, because the grab-iron was too far away from the brake wheel. This explanation apparently comes as an after-thought. Plaintiff admitted that *he did not even see the grab-iron* until after he was injured, *and didn't even know whether or not there was one.*

The obvious truth, from plaintiff's own testimony, is that he gave no thought to his own safety. He placed his hand in a position which he knew to be dangerous, when there was a safe method open to him. The court below correctly held that plaintiff was guilty of contributory negligence as a matter of law.

It has been strenuously argued by plaintiff that this decision has deprived him of his constitutional right to a jury trial. That contention has been urged upon this court in almost every case of nonsuit and directed verdict brought before us. This court is charged with the duty of protecting all of the rights of all litigants. This is especially true of those fundamental rights guaranteed by the State and Federal Constitutions. But the right to have a jury pass upon issues of fact does not include the right to have a cause submitted to a jury in the hope of a verdict where the facts undisputably show that the plaintiff is not entitled to relief.

It may be regretted that there is no federal workmen's compensation act, similar to those which have been adopted in nearly all of the states, so that a workman injured in an industrial accident, such as plaintiff here, might have recourse to some remedy for his injury. But that is a matter to be corrected by the Congress, and not by us. So long as liability is dependent upon proof of fault on the part of defendant, and freedom from fault on the part of plaintiff,

"it is not for this Court to torture and twist the law of negligence so as to make it in result a law not of liability for fault but a law of liability for injuries."

See the dissenting opinion of Mr. Justice Frankfurter in the recent case of *Johnson* v. *U. S.*, 68 S. Ct. 391, 396.

The judgment is affirmed. Costs to respondent.

McDONOUGH, C. J., and PRATT and LATIMER, JJ., concur.

WADE, Justice.

I concur on the ground that the evidence shows that plaintiff and appellant was guilty of contributory negligence. I am not prepared to hold that respondent was not guilty of negligence.