## JIMENEZ v. O'BRIEN et al.

No. 7264.  Decided December 2, 1949.  (213 P. 2d 337.)

See 32 C. J. E., Evidence, sec. 569. Release as to personal injuries avoidance of, see note, 117 A. L. R. 1022. See, also, 45 Am. Jur. 683.

*Stewart, Cannon & Hanson,* Salt Lake City, *E. F. Baldwin, Jr.,* Salt Lake City, for appellant.

*Callister, Callister & Lewis,* Salt Lake City, *Ray R. Christensen,* Salt Lake City, for respondent.

WOLFE, Justice.

Action by Jess Jimenez, plaintiff and respondent, against Ray O'Brien and Boyd B. Broadwater for damages for injuries sustained when an automobile driven by Broadwater and owned by O'Brien collided with an automobile in which the plaintiff was a passenger. The court below directed a verdict in favor of O'Brien, but directed a verdict against Broadwater. The jury found that two releases signed by Jimenez releasing O'Brien and Broadwater from liability for the consideration of $1708.40 paid to Jimenez by the insurer of the O'Brien car were void in that they were signed by Jimenez when he did not have the mental capacity to contract. This amount of $1708.40, however, was deducted by the jury from the $5000 verdict returned by them, leaving a net verdict of $3291.60. The defendant Broadwater prosecutes this appeal contending, among other things, that the evidence is insufficient to support the finding that Jimenez did not have the mental capacity to contract when he signed either of the two releases.

The facts surrounding the releases are these: Following the accident on July 6, 1945, in which Jimenez was injured, he was taken to the St. Mark's Hospital in Salt Lake City where his injuries were diagnosed as a severe brain contusion. Jimenez remained unconscious for two to two and

one-half weeks. His condition, however, gradually improved after the eighth or tenth day in the hospital. Benjamin Duncan, an insurance adjuster for the insurer of the O'Brien car, called to see Jimenez on July 13th, but Jimenez' condition rendered him incapable of carrying on a conversation. Duncan returned to the hospital in about a week at which time Jimenez was able to converse with Duncan, but he was unable to recall the facts of the accident. Duncan made repeated visits to see Jimenez, six or seven times in all. On August 13, 1945, Duncan took with him one Alice Pannier, a shorthand reporter, to the hospital where she took down a series of questions asked by Duncan and answered by Jimenez concerning the latter's family, employment, and his plans to leave for Colorado to stay with his brother when discharged from the hospital the next day. Jimenez testified at the trial that he had no recollection of this conversation. The evening of that same day, Duncan testified, he returned to the hospital and discussed a settlement with Jimenez. A tentative settlement of $1000 general damages, plus all hospital and doctors' bills was agreed upon. The next morning, Duncan further testified, someone phoned him from the hospital requesting that he come there. When he arrived he found Jimenez, fully dressed, sitting on the bed conversing with a woman friend. Duncan having in the meantime ascertained the amount of the doctor and hospital bills, presented to Jimenez three bank drafts. One draft was payable to Jimenez and the St. Mark's Hospital for $182.05; another payable to Jimenez and Dr. Alma Wright for $500; and the third payable to Jimenez for $1000. A usual form release stating that Jimenez was absolving both O'Brien and Broadwater from all liability arising out of the accident was signed by Jimenez, he adding the words in his own handwriting, "I have read this release and understand it to be a release in full." In addition, and in accordance with the practice of the insurance company, Duncan wrote in longhand what he called a supporting statement. This statement

recited the facts of the accident; that Jimenez was hospitalized; and that Jimenez understood that $1682.05 (the total amount of the three drafts heretofore mentioned) was all the money he was to receive from any source in connection with the accident. Jimenez signed this statement: "This statement is true. Jess Gimenez." The drafts were indorsed by their respective payees and cashed within a short time. On each draft above the indorsement it is stated that indorsement of the draft constitutes a release of all claims the undersigned may have against the insurance company and all persons arising out of the accident referred to on the face of the draft.

The following September 5th, Jimenez and his former wife, Rita Gounis, called at the insurance office where Duncan was employed. There, Duncan testified, Jimenez reminded him of his promise to pay all the hospital bills and stated that there was one bill which Jimenez had failed to mention to Duncan before. This bill was for $26.35 for emergency treatment rendered to Jimenez at the Salt Lake General Hospital immediately after the accident and before he was removed to the St. Mark's hospital. Duncan thereupon issued a draft, similar to the other drafts heretofore mentioned, for the amount of this bill. Immediately after Jimenez and Mrs. Gounis had left Duncan's office, it occurred to the latter that he had neglected to have Jimenez sign a release in consideration for the draft just given him. Duncan pursued Jimenez and caught up with him before he had left the office building. Jimenez voluntarily returned to the office where he signed a release similar to the one signed by him in the hospital on August 14th. This release was also signed at the bottom by Jimenez, "I have read this release and understand it to be a release in full. Jess Gimenez."

Several months later, Jimenez consulted an attorney and this action was commenced to recover damages for injuries suffered in the accident. The defendants answered, alleging that Jimenez had released them from all liability for a

good and valuable consideration. The plaintiff replied, admitting execution of the releases, but alleging that he was not mentally competent to contract at the time he signed the releases.

Counsel for both sides cite *Hatch* v. *Hatch,* 46 Utah 218, 148 P. 433, 438, as establishing what degree of mental capacity is necessary to be competent to contract. There we said,

"In ordinary contracts the test is, Were the mental faculties so deficient or impaired that there was not sufficient power to comprehend the subject of the contract, its nature and its probable consequences, and to act with discretion in relation thereto, or with relation to the ordinary affairs of life?" We expressed approval again of this test in *O'Reilly* v. *McLean,* 84 Utah 551, 37 P. 2d 770, and *Burgess* v. *Colby,* 93 Utah 103, 71 P. 2d 185.

Instruction number seven to the jury read:

"To avoid a release from liability for personal injuries, the plaintiff in this case, Jess Jimenez, has the burden of proving, by a preponderance of evidence, the invalidity of each release by clear and unequivocal and convincing evidence; otherwise the release and settlement are binding upon plaintiff and constitute a complete defense. \* \* \*"

While this instruction is somewhat confusing in that the court attempted to apply two different requirements as to the weight of the evidence, we think the jury was adequately instructed that before they could return a verdict for the plaintiff, it must be found by them by clear, unequivocal and convincing evidence that the releases were invalid. This requirement that a release can be avoided only if the evidence is clear, unequivocal and convincing that it is invalid, is well supported by the authorities. *Miller* v. *Spokane International Ry. Co.,* 82 Wash. 170, 143 P. 981; *St. Louis and S. F. Ry. Co.* v. *Chester,* 41 Okl. 369, 138 P. 150; *Moruzzi* v. *Federal Life and Casualty Co.,* 42 N. M. 35, 75 P. 2d 320, 115 A. L. R. 407, and *Wallace* v. *Skinner,* 15 Wyo. 233, 88 P. 221.

We agree with the contention of the defendant that the jury could not have reasonably found by clear, unequivocal and convincing evidence that Jimenez was mentally incompetent to contract on both August 14, 1945, and on September 5, 1945. Therefore, it is necessary to detail and analyze the evidence relied upon by the plaintiff to support the verdict. It is to be remembered that "clear, unequivocal and convincing evidence," is a higher degree of proof than a mere "preponderance of the evidence," and approaches that degree of proof required in a criminal case, viz., "beyond a reasonable doubt."

Jimenez's own testimony which is the best evidence of his understanding on those dates does not support his contention, but in fact supports an opposite position. Upon cross examination he testified that he did not remember seeing Duncan at the hospital, nor did he know him until the trial had commenced. He did admit, however, that he remembered his name. He testified that he voluntarily signed a paper on August 14, 1945, while he was still in the hospital, but did not recall any conversation had with Duncan concerning a settlement of his claim. He remembered the day because it was V-J Day (the day of the cessation of hostilities in World War II). He thought he had read the paper before he had signed it, but did not remember what it said. He did not recall having experienced any difficulty in cashing the $1000 draft.

Then for the purpose of impeaching Jimenez's testimony counsel for the defendant read the following from Jimenez's deposition taken on September 12, 1947, ten months before the trial below.

"Q. While you were in the hospital did anyone come there to settle your claim on account of the accident of July 6, while you were in the hospital? A. Just that man Duncan.

"Q. How many times did he see you at the hospital? A. I have seen him more than once. I wouldn't know how many times. * . * *.

"Q. Do you remember talking to him in the hospital? A. Yes.

"Q. Do you remember what he said to you and what you said to him? A. I don't remember that at all.

"Q. You do remember discussing the accident with him? A. If he discussed the accident that I don't remember, either.

"Q. Do you remember whether he talked to you or not about a settlement? A. Yes.

"Q But he did discuss a settlement? A. Yes.

"Q. What was said about making a settlement? A. He told me that he was going to fix the hospital bills and get a release, and he would give me one thousand dollars, and so I was concerned about getting out of there, and I didn't care about nothing else."

Jimenez admitted making the foregoing answers in his deposition and that before his discharge from the hospital he intended to go to Colorado and live there with his brother. The latter had come to Salt Lake City to get Jimenez, but had returned to Colorado before Jimenez was discharged. After discharge, Jimenez changed his plans and did not go to Colorado as planned. Counsel further read from the deposition:

"Q. Did you read the release you signed. A. Yes, but I couldn't tell you what it said. I just went through it. I couldn't tell you a thing I read.

"Q. Did you understand it at that time? A. I thought I did."

Then the cross-examiner asked Jimenez if he understood the release when he read it. Jimenez again replied that he thought he did. On re-direct examination, counsel read from the deposition the next question and answer:

"Q. You thought you did [understand the release]? A. But I knew I didn't understand it."

It is not contended by Jimenez that Duncan or the insurance company defrauded him in any manner and it is admitted that Jimenez was not under the influence of any sedative on August 14th.

Jimenez testified that he remembered he had a bill to pay at the Salt Lake General Hospital, and that he with Mrs. Gounis went to Duncan's office to get Duncan to give him a check for the amount of the bill. He testified that after he had left Duncan's office, the latter followed him and said, "come back up. I want you to sign a release." Jimenez voluntarily returned to the office where he signed a paper. He did not know if it was a release. Jimenez took the check to the General Hospital and paid the bill. Jimenez didn't testify why he went to Duncan to have him pay the hospital bill. He does not claim that he thought Duncan was gratuitouly paying his hospital bills. The only reasonable conclusion is that when he went to Duncan's office on September 5th, he thought Duncan would include in the settlement the payment of the small hospital bill, showing that Jimenez realized there was a settlement.

The plaintiff relies upon the fact that Jimenez did not correctly spell his own name when he signed the releases as indicative of contractual incapacity. In light of the surrounding circumstances there is little or no probative value in this fact. On the four drafts where Jimenez was named either as payee or joint payee, the insurance company had spelled Jimenez' name "Giminez." He accordingly indorsed the drafts "Giminez." He indorsed two of the drafts twice, once signing his name "Giminez" and then immediately below it indorsing it again "Jimenez," just as should properly be done. On each release Jimenez started to sign his name with a "J," but after making the "J" he wrote over it with a "G". It is only reasonable to suppose that someone requested him to sign the release in conformity with the spelling of his name on the drafts. In the supporting statement written in longhand by Duncan on August 14th, Duncan had spelled Jimenez's name with a "G". Jimenez here again signed his name "Gimenez."

Mrs. R. D. Loy, a close friend of the plaintiff, testified that she visited Jimenez nearly every day during his stay

in the hospital. After Jimenez regained consciousness, she said he would at times appear to be irrational, accusing Mrs. Loy and other friends of neglecting him, but that on other occasions he would appear to be rational and remember her last visit. On one occasion, she testified, Jimenez told her he had a gun under the bed and had shot some pigeons which he wanted her to take home. Mrs. Loy's testimony is not clear as to when this last happening occurred. After his release from the hospital, Jimenez frequently visited Mrs. Loy. She described his appearance on these occasions as untidy whereas previous to the accident he had been very neat in his dress. He was unable to stand any noise and was at times depressed and changeable in his plans. He walked with a stagger and his speech was labored. He purchased three issues of the same magazine and bought shirts for himself several sizes too small. He was unable to remember from one day to the next what he had done or had told Mrs. Loy. Assuming all of Mrs. Loy's testimony to be true, there is substantially nothing in it to indicate that on August 14th, and especially on September 5th, Jimenez' faculties were so impaired that he could not meet the test of contractual capacity announced in *Hatch* v. *Hatch,* supra.

The plaintiff cross assigns as error the refusal of the trial court to permit certain medical experts who testified in behalf of the plaintiff to give their expert opinion as to whether Jimenez had the mental capacity to contract at the times the two releases were signed by him. The defendants objected to the admission of the expert opinion on the ground that the question of mental capacity was the ultimate question to be decided by the jury and was not therefore a proper subject for the expression of an expert opinion. It is unnecessary for us to determine whether the exclusion on that ground was erroneous. Even if the doctors had been permitted to testify, as they offered to do, that in their opinion Jimenez did not have the mental capacity to contract at either of the times he signed the

releases, still, for reasons which we will state later, and in view of all the evidence, the jury could not have reasonably found by clear, unequivocal and convincing evidence that Jimenez did not have the mental capacity to contract.

An analysis of the testimony of the three doctors who examined Jimenez discloses that in forming their opinion that Jimenez was incompetent to contract on August 14th and on September 5th, they based their opinion upon matters which are indicative of poor judgment and an unsettled mind, but which do not reasonably admit of mental incapacity to contract. The abstract opinions of expert witnesses are not important; it is the reasons assigned in support of the opinions which are significant. *American Trust Co.* v. *Dixon*, 26 Cal. App. 2d 426, 78 P. 2d 449, and cases cited therein.

Dr. Stewart Alma Wright, a neurosurgeon who attended Jimenez while he was in the St. Mark's Hospital and who was in the best position of any of the three doctors who examined Jimenez to judge his mental capacity, testified that he had diagnosed Jimenez' injury as a severe brain contusion; and that he did not think Jimenez was able to "reason normally" on August 14, 1945, or Jimenez would not have insisted on leaving the hospital against the doctor's advice. The period of Jimenez' unconsciousness from two to two and one-half weeks, according to Dr. Wright, was indicative of the seriousness of Jimenez' injury. But Dr. Wright admitted that he did not think Jimenez was irrational on that date and that he had every reason to expect Jimenez would continue to improve. Progress notes of Jimenez' condition made daily by Dr. Wright were introduced into evidence. From them it appears, and Dr. Wright admitted, that after the eighth or tenth day Jimenez gradually improved. On July 29th, the doctor recorded, "Patient is clear mentally, but very sluggish in both mental and physical reactions." During the early part of August improvement continued. Jimenez sat up in a wheel chair, walked, and his activity increased daily. On August 11th,

it was noted that Jimenez "had no complaints whatever." Dr. Wright after examining him on August 14th, just before his discharge from the hospital, made this notation:

"Patient has no complaints and to quizzing admits of no aches, pains, weakness, paralysis or other symptoms referrable to nervous or other systems. Complete recheck is without evidence of residual pathology except patient is generally weak and still a little slow mentally."

Dr. Wright on re-direct examination stated that he based his opinion that Jimenez was not able to "reason normally" on the fact that Jimenez after having suffered a severe brain contusion, left the hospital against the doctor's advice. Inability to "reason normally" may include anything from a slight deviation from the subject's usual reasoning power to extreme irrationality which approaches insanity. But persons may be capable of willing their property or contracting, at least as to simple matters, in the sense that they know what they are doing and the consequences of their decision although their judgment which motivates them to will or to contract as they do may be poor. It is evident that Doctor Wright's opinion that Jimenez was unable to reason normally was based upon what well may have been nothing more than Jimenez' lack of good judgment rather than upon any mental deficiency bordering upon an incompetency to contract. Dr. Wright admitted that in his opinion Jimenez was not irrational on August 14th. When asked in what sense he used the word "irrational," he replied,

"Well, the word irrational, I suppose would have various meanings in various persons' minds. If we were to pin ourselves down to a medical dictionary definition of irrationality, we would have to have it before us, because I don't exactly recall what that definition would be, word for word, but in my opinion a person who is irrational is a person who is very markedly impaired from the standpoint of his mental abilities at the time. There could be all graduations and there are graduations of irrationality. A person who is completely irrational wouldn't know, wouldn't be able to reason, wouldn't be able to say things in a successful way, wouldn't be able to do anything

in what you and I would refer to as a reasonable way. But a person need not be irrational in the extreme sense of the term to have his mental capacities impaired."

As early as July 29th, sixteen days before Jimenez signed the first release, Dr. Wright noted that Jimenez was clear mentally although slow in physical and mental reactions. On August 14th, Dr. Wright noted that Jimenez was "still a little slow mentally." Every day situations abound in which contracting parties are not on the same mental plane. Yet contracts between such parties are binding not because their mental ability nor their judgment is equal, but because they both possess that degree of mental power which the law recognizes as a minimum for persons contracting viz. sufficient power to comprehend the subject of a contract, its nature and probable consequences, and to act with discretion in relation thereto, or with relation to the ordinary affairs of life.

The deposition of Dr. J. L. Rosenbloom was read at the trial. Jimenez had consulted Dr. Rosenbloom in November of 1945, at which time Jimenez told the doctor that he was tired, nervous, and unable to sleep. Dr. Rosenbloof diagnosed Jimenez' condition as post-traumatic personality or constitution. He expressed an opinion that Jimenez would always show some residual symptoms from the trauma in the nature of decreased emotional control, decreased capacity for working, and probable impairment of concentration. Dr. Garland H. Pace, who did not examine Jimenez until October of 1947, over two years after the releases had been signed, testified that Jimenez had suffered permanent damage to his personality structure. In the testimony of these two doctors as in the testimony of Dr. Wright, there is nothing to reasonably predicate an opinion that Jimenez was unable to contract on either August 14th or September 5th. Fatigue, nervousness, poor emotion control, and lack of ability to concentrate are not necessarily indicative of contractual incapacity although they well may affect a person's judgment. It does not ap-

pear that any of the doctors in formulating their opinion that Jimenez was incompetent to contract, knew and thus took into account any of the facts and circumstances surrounding the signing of the two releases. Had the doctors known the substance of the conversations between Duncan and Jimenez on August 14th and on September 5th, there is a good probability that their opinions as to Jimenez' mental capacity would have been modified. After all, the things a person does and says at or about the time he enters into a contract are the best indicia of his mental capacity to make the same. All of the doctors had observed Jimenez when he was not engaged in business matters. To give an opinion as to a person's capacity to contract at a date several years prior is not an easy task even when all the facts are made known. It is difficult to judge a person's competency to contract when that judgment must be based upon observations of his conduct and what he says when undergoing a medical examination. In this case there is an illustration of the danger attendant to allowing expert witnesses to give their opinion as to the ultimate question to be determined by the jury. An expert opinion given by a doctor is generally accorded considerable weight by a jury. It is therefore important that the opinion should be formed only after adequate observation and with all surrounding facts in mind.

Thus in view of the diagnosis of the three doctors and the reasons ascribed by Dr. Wright why he thought Jimenez was unable to reason normally, and in view of all the evidence surrounding the execution of the two releases in regard to which it does not appear that the doctors were aware when they formulated their opinion that Jimenez was not mentally competent to contract, even had the doctors' opinions been allowed in evidence, the jury could not have reasonably found from clear, unequivocal and convincing evidence that Jimenez did not have the mental capacity to contract on August 14th or on September 5th. Proof that is convincing carries with it,

not only the power to persuade the mind as to the truth or probable correctness of the fact it purports to prove, but has the element of clinching in the mind such truth or correctness. As a matter of law the plaintiff's evidence in this case falls short of that standard.

The judgment below is reversed. Costs to appellants.

PRATT, C. J., and LATIMER and McDONOUGH, JJ., concur.

WADE, Justice (dissenting).

I dissent. I think (1) that the evidence is ample to sustain the jury's finding that on August 14, and September 5, 1945, the plaintiff Jimenez lacked the mental capacity to enter into a contract, and (2) that the court erred in refusing to allow the doctors to give their opinion that he was mentally incapacitated to contract. I will consider these problems in the order above stated.

I agree with the prevailing opinion that the plaintiff can avoid the releases which he signed only on clear, unequivocal and convincing evidence that at the time of signing he lacked the mental capacity to understand the subject of the contract, the natural and probable consequences thereof and to act with discretion in relation thereto and with relation to the ordinary affairs of life. The evidence must be more convincing to establish a fact by clear and convincing proof than by a mere preponderance of the evidence but not so convincing as is required to establish a fact beyond a reasonable doubt. I think the steps between these degrees of proof should be about equal, but I think the prevailing opinion here requires greater proof than is often required in criminal cases where the law requires proof beyond a reasonable doubt. However, we must keep in mind that this is a law action, and the constitution provided for no appeal on questions of fact, and so, unless as a matter of law the facts found by the jury are not proved by the evidence we may not reverse the

decision. Before we can reverse the case for lack of evidence the findings must be such that no reasonable mind could so find in view of the evidence and all reasonable inferences, when viewed in the light most favorable to sustaining the verdict. *Raymond* v. *Union Pacific R. Co.,* 113 Utah, 26, 191 P. 2d 137; *Horsley* v. *Robinson,* 113 Utah 227, 186 P. 2d 592. As I view the prevailing opinion it entirely loses sight of the foregoing rule in its consideration of the evidence. Most of the evidence and inferences which may reasonably be drawn therefrom, hereinafter pointed out, it ignores or refuses to recognize as existing and generally it considers only unfavorable evidence and inferences which it views in their most unfavorable light to plaintiff's case.

Plaintiff was injured in an automobile accident on July 6, 1945. He suffered therefrom severe contusion of the brain, which means that his brain was bruised and brain cells destroyed. He was taken first to the Salt Lake County Hospital and on July 9, removed to the St. Marks Hospital where he remained until August 14, 1945. During that period Dr. Wright attended him, visiting him one or more times each day. The patient also visited the doctor on September 15, and November 1, 1945. The doctor testified that he was medically unconscious for from two to two and one-half weeks, but it is not clear whether he meant from the time of the accident or from the time he came to St. Marks. The three doctors who testified all agreed that the long period of unconsciousness, and the pink coloring found in the spinal fluid indicated a severe brain contusion. All three doctors gave it as their opinion that plaintiff suffered permanent injury to his brain, and that he was not normal on the dates when he signed these releases. As noted above, they were not allowed to give their opinions that on those dates he was incapable mentally to understand the nature of the contract he thereby purportedly entered into.

Mrs. Loy, a close personal friend of plaintiff, testified that she visited plaintiff once or more daily from the day

of the accident to the time he left the St. Marks and then drove him home. She testified that from the time he got in the St. Marks, "It was from two to three weeks before he knew anybody or could recognize anyone." And that "when he regained consciousness, sometimes we would go visit him and he would seem very rational." But maybe the next time when they would visit him he would not remember their previous visit a few hours earlier at all, and would complain that his friends never visited him. She further described his condition and actions after he became conscious as follows:

"Well, his physical appearance was very bad. He didn't have any coordination. He had a hard time talking. He stammered and stuttered, and it was very difficult for him to talk and yet he wanted to talk * * * and many times we would go out and he would tell me he had a gun under his bed and he had shot some pigeons. He has hallucinations he had a gun under his bed. * * *

* * * * *

"and he told me to take home the pigeons he had shot; they were in the corner of his bed.

* * * * *

"He told me to get him out of the hospital right away because he thought the doctor and the hospital were trying to run his bill up to make more money. He couldn't feed himself, but he still thought he was well and should be home.

* * * * *

"Well they fed him through veins while he was unconscious, but after he regained his consciousness we fed him about two weeks before he was able to feed himself."

The prevailing opinion, speaking of the pigeon shooting says:

"Mrs. Loy's testimony is not clear as to when this last happening occurred."

All of the foregoing testimony including that about the pigeon shooting was given in answer to the question of what occurred after he had regained consciousness or was able to recognize people. In the face of that fact, I do not

consider it a fair inference that these events occurred prior to that time. It certainly is not the inference most favorable to sustaining the verdict which can reasonably be drawn from the evidence. The tenor of this testimony is that all of these events continued to recur from the time he regained consciousness to the time he left the hospital. She said "many times" he said he had a gun and had shot pigeons, she referred to his failure to remember her previous visit of the same day not as one event, but as continuous. Although she referred to his wanting to get out of the hospital before he was able to feed himself, both she and the doctor made it clear that when he did leave the hospital he thought he was well and left contrary to his doctor's advice. If we view this evidence in its light most favorable to sustaining the verdict we must conclude that he was mentally sick up to the time he left the hospital, but thought he was well, when he was a very sick man, that he was afraid that the doctor and hospital were trying to run a needless bill up against him, when in fact the insurance company was offering to pay these bills, and he was unable to appreciate that a few days longer in the hospital would mean no additional cost to him.

The hospital progress notes are not necessarily contrary to the finding that plaintiff, when he signed the releases, lacked the mental capacity to contract. This is especially true in view of the testimony of the doctor who made the notes, that he did not consider him normal mentally at that time, and that the notes dealt mainly with his physical condition, and had no bearing on his ability to take care of himself or his ability to contract at that time.

The first entry, dated July 10th, "Patient answers questions (yes or no)" does not indicate consciousness. The next entry which deals with his mental condition dated the 14th, "Pt. made further progress. He talks rationally, recognizes individuals and asks for food," seems to be very favorable in view of the fact that only 8 days have elapsed since the accident and only four days since he came to St. Marks,

and the testimony that it was two weeks or more before he regained consciousness. No doubt this was one of his clearer days mentioned by Mrs. Loy. The entry of the next day "Patient went under moderate shock this AM," indicates a relapse and the following entries of the 18th, "Patient responds when spoken to and is clearer," of the 20th, "is clearer mentally," of the 22d, "helps move himself in bed," and of the 24th, "is more lucid," indicate progress but not necessarily consciousness. The entries of the 24th, "for first time asked for urinal," and the 29th, "Patient is clear mentally but very sluggish in both mental and physical reactions," cover about the time we would expect him to become conscious, and the entry "Patient is clear mentally" in view of the doctor's testimony simply indicates that he had regained consciousness. The later entries of the 31st, "improvement continues, but Pt. still sluggish mentally. Asks about going home," of August 4th, "improvement continues, is feeding self," of August 8th, "has been up in wheel chair past few days and walked today," of the 11th, "is increasing activity daily," and the final entry of the 14th, "patient has no complaints  *  *  *  is generally weak and still a little slow mentally," show that he had an interest in going home on July 31st; that five days later on August 4th, he first fed himself; that a few days later he got up in a wheel chair and walked for the first time on the 8th; and that his activity increased from then on but that he was generally weak and slow mentally when he left the hospital. The doctor testified he left against his advice. This, in my opinion, and in view of the doctor's explanation that he was not commenting on the patient's ability to take care of himself or to understand contracts, is not inconsistent with the jury's finding that he lacked the mental capacity to contract when he signed these releases.

The evidence tends to show that at the time he signed these releases his mind was confused as to his own plans for the future. A few days before he left the hospital someone

contacted his folks in Pueblo, Colorado, and in response thereto, one of his brothers visited him to take him to their home, but he decided to remain in Salt Lake City and his brother returned home without him and plaintiff arranged with Mrs. Loy to take him in her car to his rooming place when he should be released form the hospital. Thereafter, on August 13th, the day before he left the hospital, the claim agent questioned him and had the questions and answers taken down and transcribed by a stenographer which was received in evidence. Therein he said that he intended to go and live with his brother in Pueblo, Colorado, when released; and that his brother had arranged his train reservations for that purpose for the next day. But on the next day, he followed his arrangements with Mr. Loy and when he was released from the hospital, she took him to his old rooming place. Obviously, this shows confusion in his mind and that when he made the statement of the 13th, he did not understand his own plans and arrangements.

The statement of August 13th, and the one written by the claim agent at the time of the purported settlement on the 14th, contain contradictions, one of which throws light on his mental capacity at that time. In the statement of the 13th, he said under leading questions, that he felt that he was now ready to leave the hospital and was completely healed. This is in full accord with the testimony of Mrs. Loy, above quoted, that even before he was able to feed himself he felt he was well and the doctor and hospital were needlessly keeping him there to run up his bill, with the fact that after his brother had come from Colorado to take him home he refused to go thinking he was able to take care of himself, and with his insisting on leaving the hospital at that time against the advice of his doctor. But in the statement of the 14th, written by the claim agent, he said, "I understand that my injury may be of a permanent nature." Of course, this statement, like many others in the statement of the 14th, was the language and idea of the claim agent and not his at all, but a person with the mental

capacity to contract would have objected to signing a statement so contrary to what he considered the facts to be.

After leaving the hospital, he lived at his former rooming place in Salt Lake City trying to take care of himself. Mrs. Loy at whose home he spent much of that time, testified that he was unable to work, was very restless, unable to care for himself, or handle his affairs, but thought he was well; that he would come to the Loy home in a taxi with his shirt out, his eyes staring, his hair unkept, and his shoe laces untied; that she suggested that he try to settle his nerves by reading, and so he went and bought three copies of the same edition of Life Magazine; that he would buy his shirts several sizes too small; that he moved and talked with difficulty, walked with a stagger like he was drunk and as soon as he arrived at their home, he would fall on the couch and lie down; that he was very changeable, easily upset emotionally, often depressed and could not remember from day to day what he had said and done the day before; that one day he would complain that his friends and relatives were mistreating him and say he was going away and never return and bid them goodby but would be back the next day having forgotten that he had said he was leaving; that on other occasions he would say that his children were no good, but the next day say they were wonderful and when they tried to reason with him he would break down and cry; that finally they felt that he must have more care than they were able to give him and called his folks in Pueblo and around November 1, 1945, his brother came and took him there.

Prior to being taken to Pueblo, Jimenez was taken by Mrs. Gounis, his former wife, to the Insurance Company office where they presented to Duncan, the claim agent, a bill for $26.35 from the Salt Lake County Hospital for treatment prior to the time he was taken to St. Marks, which was paid, and he gave the usual release. Also, early in October, 1945, Mrs. Gounis suggested and took him to employ his attorney, Mr. Callister, to commence this action.

With someone he visited Dr. Wright on September 15th, and November 1, 1945, who prescribed a sedative for him.

Speaking of the presentation of the hospital bill to the Insurance Company, the prevailing opinion says:

"Jimenez testified that he remembered he had a bill to pay at the Salt Lake General Hospital, and that he * * * went to Duncan's office to get [him] to give him a check for the amount of the bill."

That opinion in discussing this event concludes that he was able, by himself, to understand that the Insurance Company had agreed to settle all his hospital bills and to hold them to their bargain. If the evidence showed that without help from others he remembered this additional bill and took it to the Insurance Company and collected the payment thereof, it would be clear that to this extent he was able to handle this business transaction. Jimenez testified as to this event that he was taken to the Insurance Company office in the first place by Mrs. Gounis, he admitted that he received the check, and that after he left and was in the lobby Duncan took him back to the office where he signed a paper.

The statement that he remembered that he had an additional bill to pay is obviously not correct because he was unconscious all the time he was in the Salt Lake County Hospital, and, therefore, could not remember anything about it. Although Duncan heard Jimenez testify that he was taken to his office by Mrs. Gounis, and later testified to his version of that event he did not deny that statement, and the appellant does not dispute it here but states that as a fact in his brief, as does the prevailing opinion. It is reasonable to infer from this evidence that the Salt Lake County Hospital presented this bill to Jimenez after he had left St. Marks, that knowing nothing about being in that hospital, he took it to Mrs. Gounis who knew of that treatment and his settlement with the Insurance Company, and she took him to the insurance company where the bill

was presented and paid. It does not require the capacity to contract for a person to be led around in this manner.

After Jimenez was taken to Pueblo by his brother he was placed under the treatment of Dr. Rosenbloom, a psychiatrist who prescribed rest treatment. He was cared for by his brothers and it was the next September before he was able to take care of himself or to go back to work. That doctor testified that he considered that he had suffered permanent injury to his mental capacity and that at the time of signing these releases he did not have the normal mental capacity.

The prevailing opinion makes much of the fact that on cross-examination he admitted having made in his deposition statements contrary to his testimony on direct examination as to what he remembered of the settlement. It concludes that because on cross-examination he admitted that in the deposition he had stated that he had seen Duncan more than once at the hospital and talked settlement with him and said:

"He told me that he was going to fix the hospital bills and get a release, and he would give me one thousand dollars, and so I was concerned about getting out of there, and I didn't care about nothing else";

that this shows that he had the capacity to contract when he signed these releases.

The record discloses that he made four different statements: 1. The statement of August 13, 1945; 2. The supporting statement written in longhand by Duncan and signed by Jimenez on August 14th, at the time of the settlement; 3. His deposition taken at the office of his attorney on September 12, 1947; and 4. His testimony at the trial. Except the deposition which is only partially disclosed by his cross-examination, all of these statements are in the record. A study of them discloses glaring inconsistencies in his statement of the facts and what he remembered of

the events surrounding and since the accident. On cross-examination he admitted that his testimony then was different from his previous deposition and although he freely admitted his previous statement in the deposition he apparently did not appreciate that the two statements were contradictory. Much of his testimony at the trial showed that he did not fully appreciate the import of simple questions, and sometimes his answer bordered on incoherency and irrationality. I think these statements rather than showing mental capacity demonstrated his incapacity even at the time of the trial to understand or consistently repeat the events as he remembered them surrounding and since the accident. The trial judge who saw and heard him give his testimony was in a much better position to evaluate his mental capacities than we are from a reading of the record. That judge held the evidence sufficient to sustain the verdict, a fact to which we should give due weight.

The prevailing opinion points out that at the end of both the releases and the supporting statement Jimenez wrote a statement to the effect that he had read the instrument and that it was a release in full. That opinion does not point out that Duncan testified that all of these statements were written at Duncan's suggestion and under his dictation. Under these circumstances such statements have little, if any, probative value in proving his mental capacity for anyone who could write, no matter how mentally incompetent, could have done the same.

Obviously, Jimenez, when he signed these releases, knew in a general way he was settling his claim and the amount he was to receive, but that does not establish his capacity to contract. Capacity to contract a settlement of a claim of this nature not only requires the ability to understand in a general way that he is settling a claim and the amount he is receiving therefor, but requires the ability to understand the nature and extent of his injuries, the natural and probable consequence of his settlement, and the ability to act with discretion in connection therewith. Section 102-

13-20, U. C. A. 1943, dealing with Guardianship defines an "incompetent" as

"any person who, though not insane, is by reason of old age, disease, weakness of mind, or from any other cause, unable, unassisted, to properly manage and take care of himself or his property."

We have held that this does not change the ordinary test of contractual capacity. *O'Reilly* v. *McLean*, 84 Utah 551, 37 P. 2d 770. But I think it throws light on just what is meant thereby. There is nothing in the evidence showing that this man did anything an eight year old child or a feeble or weak-minded person, who had learned to read and write, could not have done. But such persons do not have the capacity to contract or to properly care for or manage themselves or their property.

I do not agree with the prevailing opinion that this was a simple contract. It is quite complicated to understand the nature of his injuries and the probable effect of such settlement. Nor do I agree that a moron has the capacity to contract. Webster's International Dictionary defines a moron as "A moderately feeble minded person," and says "Most morons can do routine work under supervision. * * *" "Popularly a very stupid person." Under this definition if a moron has the capacity to contract then we should change the age of majority from 21 years to about 6 or 7 years of age, and the definition of an incompetent should be changed in section 102-13-20, quoted above, for under such a rule only a person who is completely irrational lacks the capacity to contract.

Here the evidence, when viewed in the light most favorable to sustaining the verdict, clearly shows that when he made these settlements Jimenez did not have the mental capacity to contract. He lacked the capacity to understand the nature or extent of his injuries, contrary to the advice of his doctor and friends he thought he was well when he really was still sick both mentally and physically and he did

not have the slightest conception of the value of the claim he was settling. He was confused in his mind, and he was complaining that the doctor and hospital were trying to needlessly run up his bill even though the Insurance Company was liable therefor and offering to pay it and the amount thereof would make no difference to him. He was unable to realize his own arrangements to remain in Salt Lake City, and although he had so informed his brother and sent him back home alone and arranged with Mrs. Loy to drive him to his room, he told Duncan in his statement of the 13th, that his brother had arranged train reservations for him to go to Pueblo the next day. He could not properly take care of himself, he went around with his shirt tail out, his hair uncombed, and his shoes unlaced. He could not purchase shirts that fit, nor realize that one copy of a magazine would answer his reading needs as well as three. He had to be taken by others to the Insurance Company's office to collect an additional hospital bill, to the doctor's office and to a lawyer to commence this action. Three doctors each gave his opinion that he was not normal mentally when these settlements were made, and the judge who saw and heard him give his testimony held that the evidence was sufficient to sustain the verdict. In view of these facts, I think the verdict is amply sustained by the evidence.

On the second proposition, I disagree with the ruling of the trial court that since plaintiff's capacity to contract was the ultimate question to be determined by the jury expert testimony thereon is not admissible. Such a rule is neither based on reason, logic, or convenience, nor is it historically sound. It deprives the jury of expert opinion and advice on a subject about which experts have much knowledge not known to lay men which is greatly needed if we are to reach the correct result. This rule has been severely criticized by courts and writers and is now generally recognized by people who have thought the matter through as being unsound. See Wigmore on Evidence, 3d Ed., title "Opinion

Rule," sections 1917 to 1929 inc., and as applied to "sanity" sections 1933 to 1937 inc., and cases therein cited; also American Law Institute, Model Code of Evidence, Chapter V, title "Expert and Opinion Evidence" and comments thereon by Professor Edmond M. Morgan, Reporter, of Harvard Law School, at page 25 and 145 to 158 inc.

I recognize that questions on this subject might be so framed, without defining what is meant by capacity to contract or similar terms, that the doctor would be required to determine a question of law along with giving his opinion of a question of fact, in which case his opinion would be inadmissible. Thus a doctor's opinion on whether the plaintiff had the mental capacity to contract would not be admissible without explaining what was meant by the term "mental capacity to contract" because it would require him to determine what mental capacity is required by law in order to be capable of entering into a valid contract. To answer such question would require the doctor to determine a question of law which is the exclusive province of the court and not for the jury or experts to determine. If this was all that was intended in *Re Hanson's Estate,* 87 Utah 580, 52 P. 2d 1103, it was correct. Certainly that is the import of the quotation from Page on Wills (Ed. 1901) sec. 392, on page 603 of the Utah Reports, 52 P. 2d on page 1114:

"\* \* \* A form not infrequent is something like this: 'In your judgment was testator competent to make a will?' This form finds justification in the language used in many cases where the precise point has not been presented for consideration, but *it is inherently vicious, as it presupposes that the witness knows the degree of capacity the law requires in order that the testator may make a valid will, and in addition to the opinion of the witness as to testator's sanity, such* a question calls for the opinion of the witness as to the law. \* \* \*

" 'What degree of mental capacity is necessary to enable a testator to make a valid will, to what extent and with what degree of perfection he must understand the will and the persons and property affected by it, or to what extent his mind must be impaired to render

him incapable, is a question of law exclusively for the Court, with which the witnesses have nothing to do  *  *  *.' " (Italics added.)

Also what we said in that case on this question was not necessary for the decision because we held that even if there was error it was not prejudicial.

But that was not the basis of the objection in this case nor the grounds on which it was sustained by the trial court. The doctors were asked for their opinions on whether plaintiff at the times in question had the mental capacity to

"comprehend the subject of a contract, its nature, and its probable consequences, and to act with discretion with relation thereto, or with relation to the ordinary affairs of life."

Certainly that question is not subject to the objection pointed out in Page on Wills above quoted.

Since no other objection was raised, and there could be no other valid objection interposed to these questions, our problem is to determine whether the mere fact that each doctor was asked to express an opinion on the ultimate question to be decided by the jury is sufficient grounds for the exclusion of his opinion thereon as an expert. The late professor John H. Wigmore, in his incomparable work on evidence thoroughly analyzes this doctrine from the standpoint of history, logic, experience and as an aid to the court in determining the truth and concludes that it is unsound from all of those standpoints and the result of confusion from catch phrases.

Mr. Wigmore points out, sec. 1917, supra, that originally lay witnesses were allowed to give their opinions based on facts within their personal knowledge and that skilled witnesses were allowed to give opinions within their special knowledge but not based on their own knowledge of the facts of the case. Later the American courts recognized that in some cases the description of the facts and events,

in the case by the lay witness without his opinion, expresses to the trier of the facts, the situation just as clearly and vividly as with such opinion, and in such cases since the jury ultimately must determine such facts the opinion of such lay witnesses were superfluous, and, therefore, were excluded. In excluding this testimony, the courts used the phrase, "that is the question which the jury must determine" and from this catch phrase some courts have come to the conclusion that in all cases both of lay witnesses and experts it is improper to receive opinion evidence on the very question, or the ultimate question of fact which the jury must determine.

In sec. 1918, supra, Mr. Wigmore points out that such ruling overlooks the fact that the very object of expert testimony is to aid the jury in determining the facts where the expert has knowledge not possessed by the jury and that it is of just as much aid to the jury where the opinion is on the very ultimate fact which the jury must decide as where it is on a question of evidentiary fact, and that the true basis of the rule is

"simply that his testimony, otherwise unobjectionable, is not needed, is superfluous."

In this respect he says:

"* * * It simply endeavors to save time and avoid confusing testimony by telling the witness: 'The tribunal is on this subject in possession of the same materials of information as yourself; thus, as you can add nothing to our materials for judgment, your further testimony is unnecessary, and merely cumbers the proceedings.' It is this living principle which is (or ought to be) applied in each instance; nothing more definite than this is the test involved by the principle. In some instances, one witness may be able to give real help to the tribunal, while another may not,—as where we should listen to the estimate of a certain bullet's calibre by a gunmaker, but not to that of the ordinary witness who found it and produces it. In other instances, no witness at all may be capable of giving real help,—as where clothes of the deceased are brought into court, and the question is whether they were what is commonly described as black. In still other instances, any witness whatever could give the tribunal

real help, as in all cases of past events which have to be described by the observers. There is, thus, no special department of knowledge and no fixed formula involved. We are dealing merely with a broad principle that, whenever the point is reached at which the tribunal is being told that which it is itself entirely equipped to determine without the witness' aid on this point, his testimony is superfluous and is to be dispensed with."

Further in section 1920 supra, he says:

"A phrase, often put forward as explaining why the testimony we are concerned with is excluded, declares that the witness, if he were allowed to express his 'opinion', would be 'usurping the functions of the jury.'

\* \* \* \* \*

"This phrase is made to imply a moral impropriety or a tactical unfairness in the witness' expression of opinion.

"In this aspect the phrase is so misleading, as well as so unsound, that it should be entirely repudiated. It is a mere bit of empty rhetoric. There is no such reason for the rule, because the witness, in expressing his opinion, is not attempting to 'usurp' the jury's function; nor could he if he desired. \* \* \*"

And sec. 1921 supra:

"Another erroneous test, prevalent in some regions, and nearly allied to the preceding one, if not merely another form of it, is that an opinion can never be received when it touches 'the very issue before the jury.'

\* \* \* \* \*

"The fallacy of this doctrine is, of course, that it is both too narrow and too broad, measured by the principle. It is too broad, because even when the very point in issue is to be spoken to, the jury should have help if it is needed. It is too narrow, because opinion may be inadmissible even when it deals with something other than the point in issue. Furthermore, the rule if carried out strictly and invariably would exclude the most necessary testimony. When all is said, it remains simply one of those impracticable and misconceived utterances which lack any justification in principle."

Mr. Wigmore, as ever, thoroughly documents his conclusions showing that the better reasoned cases hold in accordance with his contention. The American Law Institute in its Model Code of Evidence, supra, adopts fully

Mr. Wigmore's contentions pointing out that most courts
"purport to reject all opinions, lay and expert, upon issues ultimately to be decided by the jury, but in many cases the fact that the opinion covers a jury issue is conveniently overlooked."

If the court erred in refusing to allow the doctors to give the excluded testimony then we should assume that the opinion of each doctor would have been as favorable to the plaintiff as it could possibly be, in determining whether the evidence is sufficient to sustain the verdict. If there is any doubt that it would be that favorable as is suggested a number of times in the prevailing opinion then we should give the plaintiff a new trial and thereby the opportunity to find out just what the doctors would testify.

The prevailing opinion through a labored construction of Dr. Wright's testimony seems to conclude that he did not intend to indicate that Jimenez was mentally incapable of entering into a contract but merely intended that he was slightly sub-normal. It also suggests that if all of these doctors had been confronted with the testimony of Duncan concerning the signing of these releases their testimony might not have been favorable to Jimenez. Here, again that opinion clearly demonstrates that the conclusion reached therein is based on a view of the evidence and the inferences to be drawn therefrom most unfavorable to the plaintiff rather than on taking the evidence and inferences most favorable to him that is possible within reason, as the law requires.

It is also suggested in the prevailing opinion that since Dr. Wright offered as one reason why he thought Jimenez incompetent the fact that he refused against his doctor's advice to remain longer in the hospital does not show a lack of capacity to contract but merely a lack of sound judgment. One of the elements of the capacity to contract is the capacity to understand the probable consequences of the contract and to act with discretion in relation thereto which requires the exercise of sound judgment. In any

event the lack of the ability to contract and the ability to use sound discretion is only a question of degree, not two distinct problems.

I venture the opinion that the excluded opinions of these doctors, two of whom treated the plaintiff over an extended period of time and had the opportunity to see him, observe his actions, hear him talk and answer questions, and all of whom are trained on the questions involving the human mind, would be of great aid to the court and jury in determining whether he had the capacity to contract. Even a lay person who sees the actions of another and hears him talk is greatly aided in determining his mental capacity and his opinion thereon would be worth much more than a person who has not seen such person or heard him talk but merely read a description of his actions. This is similar to determining whether a person is intoxicated. A person who has seen his actions and heard him talk describes his condition more vividly by the statement that such person was drunk than he could by a many worded description of his words and actions. Here the testimony of these doctors on the question at issue should be entitled to great weight since they are trained in the workings of the human mind and have observed at first hand his words and actions.

Obviously, there are few cases where expert testimony would be more helpful than in this case, since the effect on the human mind of a serious brain contusion is little known or understood by lay persons as compared to the knowledge of experts on that subject. The testimony of these experts not only on the general subject, which was admitted, but on the very question which the jury was required to determine would have been of great assistance to the jury and would have aided us in determining the sufficiency of the evidence to sustain the verdict. In my opinion this evidence was excluded on "a mere bit of empty rhetoric" which was clearly error.

In reversing this case this court holds to be unreasonable the decision of the trial judge and eight jurors all of whom saw and heard the witnesses and were therefore in a much better position to evaluate plaintiff's mental capacity than we are, and the opinions of three physicians, two of whom treated the plaintiff at or near the time he signed these contracts. I think we are wholly unjustified in so doing by the record.